### SOUTHERN PACIFIC TRANSPORTATION COMPANY

v.

### The TUG CAPT. VICK, her engines, boilers, tackle, etc., and A–Line Towing Company.

### Civ. A. No. 75–1271.

United States District Court,
E. D. Louisiana,
Section "I".

Dec. 30, 1977.

Harvey G. Gleason, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, La., for plaintiff.

Cecil Solomon, Hinds & Meyer, Houston, Tex., W. J. Larzelere, Jr., Lemle, Kelleher,

Kohlmeyer & Matthews, New Orleans, La., for defendant.

JACK M. GORDON, District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This civil action arises out of a collision that occurred between the three-barge tow of the pushboat CAPTAIN VICK and the Berwick railroad bridge. The Court allowed the Southern Pacific Transportation Company to orally amend its complaint to join the M/S CREOLE STAR and LeBeouf Brothers Towing Company, the vessel owner, as additional parties defendant in the matter, along with the M/S CAPTAIN VICK and her owner, A-Line Towing Company. Trial of the matter was held March 10, 1977, after which the parties were afforded the opportunity to present additional briefs. The Court then took the matter under submission.

## FINDINGS OF FACT

1.

During July, 1974, continuing to the present:

(1) Southern Pacific Transportation Company, a corporation duly qualified to do business in Louisiana, has been the owner and operator of the Berwick Bay railroad drawbridge which spans the Atchafalaya River near the Louisiana towns of Morgan City and Berwick; (2) A-Line Towing Company, a Texas corporation, doing business upon the navigable waters of Louisiana, owned and operated the towboat M/V CAPTAIN VICK; and (3) LeBeouf Brothers Towing Company, Inc., a Louisiana corporation, owned and operated the towboat M/V CREOLE STAR.

2.

The Berwick Bay railroad drawbridge is a single track bridge with a vertical lift span. The bridge provides 73 feet of vertical clearance and 320 feet of horizontal clearance through the draw. Four dolphins, each located on a corner of the 320-foot

draw of the bridge and approximately 110 feet from the bridge, form the protective fender system. Each dolphin is surrounded by pipe pilings, added to give the dolphins additional protection from the impact of a vessel. Based on the permit issued by the Secretary of the Army and the specific approval granted by the United States Coast Guard, the bridge owners are authorized to maintain the bridge and its fender system in the condition that existed in July of 1974. Located on the east side of the bridge is a bridge tender's hut which houses bridge tenders, who are on duty 24 hours a day to safely operate the bridge.

3.

Positioned respectively approximately 600 yards and 700 yards north of the railroad bridge are the new Highway 90 replacement bridge and the old Highway 90 bridge structure. Approximately a mile and one-half above the railroad bridge, on the Morgan City side of the river, lies the Conrad Shipyard, which is positioned in a bend of the river, making it difficult for downbound vessels above the shipyard to see any water traffic in or near the railroad bridge.

4.

On the morning of July 14, 1974, the river conditions on the Atchafalaya were considered swift with a three-to-four mile per hour current flowing south. Because of the velocity of the flow of the Atchafalaya River in the vicinity of the three bridges, on this day the Coast Guard had in effect a special "Local Notice to Mariners" No. 1-74. The bridge tender, Harry Kirsh, testified that the visual signals indicating that the Notice was in effect, were displayed on the top span of the railroad bridge.

Various restrictions were placed on tugboats navigating through the three-bridge area when the mariners' notice was in effect. Of importance to the parties involved in this litigation were the following requirements:

(1) Any southbound tug with a non-integrated tow (a tow consisting of barges with varying beams and drafts) had to trip each

individual barge through the bridge openings, rather than proceed through with barges in tandem; and

(2) All northbound vessels had to yield the right of way to any downbound vessel when both vessels were going to enter the bridge opening at the same time.

5.

On the morning of the accident, the Berwick Bay railroad bridge tender, Tommy St. Marie, was on duty. The bridge house had two VHF radios which continually monitored VHF channels 16 and 13, call channels for marine traffic. The bridge house also had reporting devices which continuously recorded all transmissions from either channel. The tape recorder would automatically commence recording as soon as any transmission was received on the radio sets in the bridge house and automatically shut off when the transmission was concluded. Though it is impossible to discern the exact time of all the transmissions made on the morning of the collision, the recording does give an accurate chronological account of pertinent conversations between certain vessels and between vessels and the bridge. This recording has made it possible for the Court to piece together the events of the morning climaxing with the collision between the M/S CAPTAIN VICK and the Berwick Bay railroad drawbridge.

6.

Just prior to making any radio contacts relative to passage through the three bridge openings, the CAPTAIN VICK was traveling down the Morgan City-Port Allen route, southbound in Flat Lake, heading for the Berwick Bay railroad bridge. The tug, a small pushboat with a 600-horsepower, single screw engine, was pushing three empty barges, comprising a tow of some 550 feet in length. Because of the varying beams and drafts of each of the individual barges, the tow was classified as non-integrated and, thus, came within the force and scope of the Mariners' Notice.

7.

Douglas Spikes, who was captain of the CAPTAIN VICK that morning, had traveled through the three bridges on several occasions and was familiar with the location of each bridge and with the general position of the three bridges below the Conrad Shipyard. Captain Spikes also had knowledge of the Local Notice to Mariners No. 1–74, which at times was imposed on vessels navigating through the bridge openings.

The captain contends that the day markers signifying the imposition of the Notice were not visible to any downbound vessel until that vessel reached a point below the highway bridges; the newly constructed span of the replacement Highway 90 bridge allegedly obscured vision. Yet, Spikes did admit that he realized that the river was running swift that day. He also acknowledged that he was aware that Coast Guard restrictions were imposed under like conditions to aid navigation through the bridges. Though he was aware that a Coast Guard vessel and a bridge tender, both located in the vicinity, had knowledge of any restrictions imposed, he never attempted to call them to inquire about restrictions. While suggesting that the Coast Guard or bridge tender should have disclosed that the Notice was in effect, Spikes admitted that he never disclosed that he was pushing a non-integrated tow.

8.

South of the railroad bridge, the CREOLE STAR was proceeding northbound in the lower Atchafalaya River, with one loaded gasoline tank barge, measuring approximately 195 feet in length. Just prior to any radio contact relevant to passage through the bridge openings, the CREOLE STAR was at a location known as "One-arm Landing," approximately one-half mile below the railroad bridge and just below the entrance to the Intracoastal Canal.

9.

Pilot Loupe and Captain Dupre of the CREOLE STAR were both familiar with the location of the bridges, navigational

hazards posed by the bridges at times of swift current, and the Notice to mariners that would be placed in effect by the U. S. Coast Guard, when additional precautions for safe passage through the bridge openings were warranted.

## 10.

The first relevant radio transmission on the morning of the collision was as follows:

CREOLE STAR: WZA2374 the CREOLE STAR checking southbound traffic in Atchafalaya River, coming down on the Morgan City Railroad Bridge.

JAVELINA: The CAPTAIN VICK and the JAVELINA are southbound in Flat Lake. WBX3822 the JAVELINA.

CREOLE STAR: CREOLE STAR is northbound at One Arm Landing. We'll be coming through the Morgan City Railroad Bridge shortly. One load of gasoline.

Pilot Loupe of the CREOLE STAR stated that at the time of this conversation he did not have possession of his mileage chart. He estimated that the CAPTAIN VICK was seven miles above the railroad bridge, when as Loupe later admitted at trial, the CAPTAIN VICK might have been as close as four miles above the railroad bridge. Pilot Loupe initiated this conversation with southbound river traffic in an apparent effort to determine if he would have unimpeded passage through the three bridge openings. Loupe testified that at the time of the conversation, the CREOLE STAR was making three miles an hour over land.

## 11.

The CREOLE STAR, in the next transmission, sought clearance from the railroad bridge:

CREOLE STAR: CREOLE STAR WZA 2374 to Morgan City Railroad Bridge. Come in please.

TOMMY ST. MARIE (bridge tender): Morgan City Railroad Bridge . . .

CREOLE STAR: I'm northbound, one loaded gasoline barge, Captain. Passing One Arm Landing right here, coming to the bridge in a little while.

TOMMY ST. MARIE: Okay. Mighty fine Captain. Bridge is open for traffic.

CREOLE STAR: Okay. You don't see anything coming southbound?

TOMMY ST. MARIE: No Capt. Not at the moment.

CREOLE STAR: Okay. I heard the JAVELINA and the CAPTAIN VICK in Flat Lake over there. So I'll have time to make the bridge before they start down.

Pilot Loupe, while approximately one-half mile below the railroad bridge, had contacted the bridge tender to determine if the draw was open and if any southbound vessels were approaching the bridge area.

## 12.

The CAPTAIN VICK acknowledged that it was cognizant of the presence of the northbound CREOLE STAR:

JAVELINA: Got the CREOLE STAR coming up through the bridge with one loaded barge.

CAPTAIN VICK: CREOLE STAR, yeah, I heard him when he come out of the intercoastal. I figured he was getting up that way somewheres.

## 13.

The CREOLE STAR, in conversing with the vessel CORINA, gave its position:

CREOLE STAR: RCH 2374 CREOLE STAR at buoy—20 Grand Point, Skip, are you working through the railroad bridge or are you going to the Canal? (Intracoastal Canal.)

CORINA: CORINA back, I'm going in Canal. I just got out I'm made up, and I'm trying to make it this time.

CREOLE STAR: I'm going to take a shot at the bridge there. The CREOLE STAR clear.

Shortly after this conversation, Pilot Loupe reduced the speed of the CREOLE STAR to allow the CORINA to navigate into the Intracoastal Canal. He did not remember his exact speed at that time nor

the length of time he maintained this reduced speed, but the pilot admitted that the CREOLE STAR was almost dead in the water.

### 14.

The CAPTAIN VICK, shortly before entering the Atchafalaya River from the Port Allen route, communicated with the CREOLE STAR:

CAPTAIN VICK: CAPTAIN VICK to CREOLE STAR.

CREOLE STAR: 2374 the CREOLE STAR back to CAPTAIN VICK, go ahead.

CAPTAIN VICK: I'm fixin' to come out of Port Allen route. I'll be headed down shortly, come back.

CREOLE STAR: Yeah, okay, Captain. I'll be on the lookout for you then. You're going to be the first one or the JAVELINA is ahead of you?

CAPTAIN VICK: I'm ahead of the JAVELINA, come back.

CREOLE STAR: Okay, I'll be ready to stick my nose in the bridge. I got one loaded gasoline barge.

CAPTAIN VICK: Okay Captain, I got three lights. I got three lights, come back.

CREOLE STAR: Yeah, okay, okay, see you up there then.

CAPTAIN VICK: See you on the one then Captain. I'll be over on the Berwick side. I'll be on the one.

CREOLE STAR: Roger, roger. 2374, the CREOLE STAR.

Both pilots realized the hazards of two vessels attempting to navigate the three bridge openings while the Atchafalaya current was running swiftly but made little effort to coordinate their navigational passage with any precision. Though Captain Spikes gave an approximate location of the CAPTAIN VICK, and a brief description of his tow, he volunteered no information concerning the speed of her travel. Nor did he make any attempt to have Pilot Loupe further clarify the pilot's ambiguous statement of the CREOLE STAR's position.

Pilot Loupe, on the other hand, made no effort to learn the speed at which the CAPTAIN VICK was approaching the bridge opening; nor did he feel compelled to give the CAPTAIN VICK a definite mileage location or landmark location of the CREOLE STAR.

### 15.

After coming out of the Port Allen route, and while some two to two and one-half miles above the railroad bridge, the CAPTAIN VICK made a crucial radio transmission to the railroad bridge:

CAPTAIN VICK: CAPTAIN VICK to Morgan City railroad bridge.

TOMMY ST. MARIE: Morgan City railroad bridge.

CAPTAIN VICK: I just come out of Port Allen route with three big lights on the head, one little one and two big ones. That boy coming through you yet? Come back.

TOMMY ST. MARIE: He's just fixin' on comin' now, Captain.

CAPTAIN VICK: Yeah, you think he'll have plenty of time? Come back.

TOMMY ST. MARIE: Oh, yes, he should have, yes.

CAPTAIN VICK: Yeah, okay. I'm going over to the Berwick side and come through you from there. Come back.

TOMMY ST. MARIE: Okay, mighty fine, Captain. Bridge will be open. I'll be waiting on you.

CAPTAIN VICK: All righty, thank you very much. CAPTAIN VICK, going back to 16.

TOMMY ST. MARIE: Morgan City railroad bridge clear with CAPTAIN VICK.

Captain Spikes, without announcing the CAPTAIN VICK's speed or exact distance from the bridge, and while still not in sight of the railroad bridge, asked the bridge tender whether he thought the CREOLE STAR would have plenty of time to clear the railroad draw.

The bridge tender, without making an independent determination of the speed and

exact location of the CAPTAIN VICK, or the speed of the upbound CREOLE STAR, did make the positive representation that the CREOLE STAR would have plenty of time to pass through the railroad bridge. But of more importance, the bridge tender misrepresented to the CAPTAIN VICK that the CREOLE STAR was "just fixin' on comin' now," when in fact, the vessel was slowly proceeding toward the bridge while more than 600 yards below it. When bridge tender St. Marie was asked at trial what he meant when he gave that statement concerning the position of the CREOLE STAR, he testified that he intended to convey that the CREOLE STAR was in the bridge.

### 16.

Subsequent to Captain Spikes' conversation with the bridge tender, the CREOLE STAR engaged in conversation with an unidentified vessel:

UNIDENTIFIED: That northbound boat through the bridge, skip, are you going northbound through the bridge with one barge?

CREOLE STAR: CREOLE STAR to boat calling. Roger, fixing to go through the bridge now.

UNIDENTIFIED: Okay, I am just leaving the point now. Just wanted to cut ahead of you. Gonna be southbound, going on two whistles.

CREOLE STAR: CREOLE STAR back, you leaving the point now?

UNIDENTIFIED: Yes, roger. I'll pull ahead of Twenty Grand. I didn't want to cut in front of you in case you was eastbound, that's all. Okay, Skipper, good morning.

Though Pilot Loupe never suggested that he also reduced his speed to allow the unidentified vessel to pass in front, he never confirmed that the CREOLE STAR had resumed its speed of three miles per hour after slowing for the earlier maneuver of the CORINA. There is a strong indication that the CREOLE STAR maintained its reduced speed until this unidentified vessel had crossed into the Atchafalaya River from the Intracoastal Canal. Based on the log times noted by the bridge tender, it took the CREOLE STAR some 29 minutes to travel 800 yards. Under those circumstances, it is clear that during a substantial part of her approach, she was traveling below three miles per hour.

### 17.

Captain Spikes, while navigating just above the Conrad Shipyard and close to the Morgan City side of the river, made a significant transmission to the CREOLE STAR to find out her location. Though Captain Spikes testified at trial that he was below the shipyard when he made the call to the CREOLE STAR, the Court finds the captain's taped statement uttered contemporaneously with the events relating to the collision, to be more revealing. Captain Spikes exclaimed: "Good God, I am coming upon the shipyard here already, Captain. Work on it." It is abundantly clear from the captain's statement that the CAPTAIN VICK was not yet abreast of the shipyard when he made his call.

There is further evidence corroborating this taped statement of position made by Captain Spikes. Until a vessel close to the Morgan City side of the river comes abreast of or perhaps below the Conrad Shipyard, the pilot cannot see the draw of the railroad bridge. Captain Spikes confirms that the CAPTAIN VICK was not below the shipyard at the time of the transmission, since he indicated at trial that he continued down river and to its middle after the transmission from the CREOLE STAR so that he could see into the draw of the railroad bridge.

Furthermore, Captain Dupre of the CREOLE STAR, while admitting that he had no lookout, testified that he looked to the north at the time of the transmission but could not see the CAPTAIN VICK. Bridge tender Kirsh, who relieved St. Marie around 7:30 a.m., stated that when he saw the CREOLE STAR about to enter the fender system of the bridge, he looked to the north, and saw no sign of the CAPTAIN VICK.

Hence, as fully substantiated by several parties, while just above the Conrad Shipyard, the CAPTAIN VICK engaged in this conversation with the CREOLE STAR:

CAPTAIN VICK: CAPTAIN VICK to CREOLE STAR, how you doing?

CREOLE STAR: CREOLE STAR to CAPTAIN VICK, fixing to stick my nose in the bridge now, over.

CAPTAIN VICK: Good God, I am coming up on the shipyard here already, Captain. Work on it.

CREOLE STAR: CREOLE STAR back. We are going up the Port Allen route.

CAPTAIN VICK: I done come out of the Port Allen Lock since you were sticking your nose in it. I'm coming up on Conrad Shipyards now, come back.

CREOLE STAR: Yeah, well, just about to stick my nose in the bridge, too late to back down now.

CAPTAIN VICK: I may have to back down. CAPTAIN VICK.

### 18.

Captain Spikes stated his opinion at trial that he could successfully back down his tow and reverse directions in the Atchafalaya River if he started reversing his engines at a point in the river above or abreast of the Conrad Shipyard. Yet, while "just coming up on the Conrad Shipyard," and on finding out that the CREOLE STAR had not even entered the railroad bridge opening, Captain Spikes elected not to reverse engines but to maneuver into the middle of the river so as to have a view through binoculars of the CREOLE STAR's position in the bridge. To arrive at this position in the river where he would have an unobscured view of the railroad bridge, Captain Spikes had to navigate several hundred yards further downstream and into the main flow of the current.

This conduct was motivated in no small part by Captain Spikes' unwillingness to believe that the CREOLE STAR had properly stated her position. Though he was now being told that the CREOLE STAR was just putting her nose into the bridge, on two earlier occasions, the bridge tender St. Marie and pilot Loupe had represented that the CREOLE STAR was just about to enter the railroad bridge. Unfortunately, Captain Spikes' worst fears were realized, since the CREOLE STAR was indeed still in the bridge draw.

At this point, while the CAPTAIN VICK was in the main current of the Atchafalaya River below the Conrad Shipyard, proceeding at better than seven miles per hour to maintain steerage, Captain Spikes decided to start backing his engines.

Captain Spikes announced this decision in the following transmission:

CAPTAIN VICK: CAPTAIN VICK to CREOLE STAR. I'm backing down full, Captain, but I sure hate a liar.

CREOLE STAR: CREOLE STAR back. Yeah, I know what you mean. I just got at the wheel just right before you called. My partner, they told me you was still in the Port Allen route over there.

CAPTAIN VICK: Yeah man, I tell you, Man, told me he was sticking his nose in there, and I was a mile up the Port Allen route.

CREOLE STAR: Yeah, well, sorry that happened, but like I say, I just got at the wheel, oh, just a couple of minutes ago.

CAPTAIN VICK: Well, I am backing full, Captain, all the way. I don't know whether I can stop it or not, but I am backing.

CREOLE STAR: Yeah, well, okay then, just in the bridge right now, then, I tell you, I'm not breaking no speed records either.

CAPTAIN VICK: Yeah, well, I knew that, I know how this river is running. It's running more than the Mississippi right now. Come back.

### 19.

As Captain Spikes attempted to stop his tow, he found that the CAPTAIN VICK lacked the power and maneuverability to keep the tow from turning crossways in the river. When the captain finally succeeded

in halting the tow, after some fifteen to twenty minutes of reversing the engines, the bow barge was resting near the new Highway 90 bridge and the tug, CAPTAIN VICK, was near some moored boats tied on the Berwick side. During this same period, the CREOLE STAR had navigated up the Morgan City side of the river and cleared all three bridge openings.

### 20.

Once Captain Spikes felt that the CAPTAIN VICK had drifted too dangerously close to the Berwick side, he decided to make a run at the railroad bridge. The captain then came about full to straighten his tow in the river, passed through the Berwick side span of the new Highway 90 bridge, and approached the railroad bridge from a westerly diagonal.

To negotiate through the railroad bridge draw, Captain Spikes attempted to slide off of the northwest dolphin of the bridge's fender system. The second barge in the tow extended out seven and one-half feet beyond the side of the bow barge, forming a notch or variation. This notch made contact with two vertical pilings surrounding the northwest dolphin, completely dislodging one, and bending the other piling below the water level. At impact, the bow barge broke loose from the remaining tow, and hit the southeast dolphin of the fender system, causing damage to some vertical sheet pilings.

### 21.

Though bids for the repair of the damaged pilings were solicited by Southern Pacific Railroad Company, only Boh Bros. Construction Company entered a bid, and consequently was selected to make the repairs.

### 22.

Under the repair contract and specifications incorporated in that contract, Boh Bros. Construction Company was to furnish all labor, equipment and materials, excepting from the materials pipe pilings as stated in Section 9 of the plans and specifications:

9:01 Material:

a) Pipe piles: Shall conform to the requirements of ASTM A252 Grade 2 and will be furnished by the railroad to site designated by contractor for fabrication;

9:04 Payment: Payment will be made at the lump sum price bid, which price shall include furnishing all material, except pipe piles, driving piling, . . .

### 23.

The total repair cost for replacing the pilings damaged by the impact of the tow of the CAPTAIN VICK is as follows:

(a) Boh Bros. Construction Company (contract for labor, equipment, certain materials) $ 58,378.00

(b) Romar Steel Co., Inc. (steel for pipe piles) 13,860.00

(c) Modjeski and Masters (engineering services) 1,518.00

TOTAL $ 73,756.00

## CONCLUSIONS OF LAW

 This Court has jurisdiction of this case by virtue of the admiralty and maritime subject matter of the claims involved. United States Constitution Article III, § 2; 28 U.S.C. § 1333; 46 U.S.C. § 740; Rule 9(h), Fed.R.Civ.P. In a collision case such as this, the Court will consider the principles and precedents of admiralty law, *United ed States v. Reliable Transfer*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), The Rules of the Road for Inland Waters, 33 U.S.C. 221, the Coast Guard's Local Notice to Mariners, No. 1–74, promulgated under the authority of 33 C.F.R. 6.04, and Drawbridge Operation Regulations, 33 C.F.R. 117.1.

In order to hold a party responsible to the extent of its degree of fault in causing the collision between the CAPTAIN VICK and the Berwick Bay railroad bridge, this Court must follow the mandate enunciated by the United States Supreme Court in *Reliable Transfer, supra.* The Supreme Court, in rejecting the divided damages rule, held as follows:

We hold that when two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damages is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative *degree* of their fault. (Emphasis supplied.) 95 S.Ct. at 1715, 1716.

■ Thus, rather than dividing damages equally amongst those parties shown to have been in some way responsible for a collision, the Supreme Court has devised a more equitable distribution of damages formula wherein the Court shall allocate responsibility for damages proportionate to the degree of fault attributed to each responsible party.

■ Where a party is shown to be statutorily at fault, it still bears the burden under the rule of *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874) of not only showing that its fault did not cause the collision, but that it could not have caused the collision, before exonerating itself of liability. While the rule of *The Pennsylvania* still casts fault upon a party who has violated a statute and cannot overcome the heavy presumption, in view of *Reliable Transfer*, that fault must now be measured in its proportionate degree.[1] Such an interpretation of *Reliable Transfer, supra,* is amply borne out in the Supreme Court's comment:

. . . the potential unfairness of the division [divided damages rule] is magnified by the application of the rule of The Pennsylvania . . . , whereby a ship's relatively minor statutory violation will require her to bear half the collision dam-

---

1. The Supreme Court in *Reliable Transfer* recognized that it needed to scuttle a vintaged but inequitable jurisprudential rule that apportioned damages equally amongst delinquent parties regardless of their degree of fault. If the "comparative fault" rule is to have any significance, it must serve to mitigate the harsh results of the *Pennsylvania* rule. Under the *Pennsylvania* rule, when a party violates a navigational statute or regulation, both a presumption of negligence and a presumption of causation arises against the delinquent party. Though the violator might demonstrate that under common law tort principles it cannot be found liable, since the breach of the statute did not contribute to the accident, such a showing would not necessarily satisfy the heavy burden of rebutting the presumption established by the *Pennsylvania* rule. Once a party has violated a navigation statute, he must demonstrate that his violation "could not have contributed to causing the accident." The federal courts have not been altogether blind to the possible unjust results of the *Pennsylvania* rule and, on occasion, have softened the presumption of causation on the violator. *National Bulk Carriers v. U. S.*, 183 F.2d 405 (2d Cir. 1950), cert. denied 340 U.S. 865, 71 S.Ct. 89, 95 L.Ed. 631; see dissent 183 F.2d at 410; *Compania de Maderas v. Queenston Heights*, 1955 A.M.C. 797, 220 F.2d 120 (5th Cir. 1955), cert. denied 350 U.S. 824, 76 S.Ct. 52, 100 L.Ed. 736.

The British courts long ago recognized the inflexibility and possible untoward results of having a presumption of fault against any vessel violating a collision statute. In the British Maritime Conventions Act of 1911, the British abolished the presumption of fault, leaving to the court to decide, in accordance with the ordinary rules with regard to burden of proof and on the evidence adduced before it, whether such breach of the collision regulation, like any other kind of fault, was causative or not. (Maritime Conventions Act of 1911, § 4–1.) The *Reliable* decision, *supra,* now allows United States Courts fairly to apportion liability in relation to the parties' degree of fault. In calculating the degree of fault, the court must consider, under basic common law tort principles, the blameworthiness of each vessel and the extent to which the vessel contributed to the accident. Yet the *Pennsylvania* rule's awesome burden for rebutting the presumption of causation, at times would require the court to ignore these same tort principles and assess at least some liability against a party, though under the circumstances of a collision, that party's fault did not contribute to the accident. Certainly if the courts have the recognized responsibility of measuring the extent of liability, then they also should be entrusted with deciding if any liability should attach.

Like the divided damages rule, the *Pennsylvania* rule was also created to induce care and vigilance on the waterways. If either has accomplished this design, it has done so through a crude and curious form of justice. The presumption of causation of the *Pennsylvania* rule is unnecessary, inequitable, and ineffective in accomplishing its original design; like the divided damages rule, it should be abolished, or at least the burden of rebuttal must be reduced.

age unless she can satisfy the heavy burden of showing "not merely that her fault might not have been one of the causes, or that it probably was not, but that it *could not have been.*" (Emphasis supplied.) 95 S.Ct. at 1713

The Court has reached the following conclusions in assessing the degree of fault of each party in the litigation.

## NEGLIGENCE OF THE CAPTAIN VICK

■ There has been considerable discussion by the parties about the presumption of negligence that allegedly arose when the CAPTAIN VICK struck the stationary bridge. *Petition of M/V Elaine Jones*, 480 F.2d 11 (5th Cir. 1973). While the Court finds that the CAPTAIN VICK cannot prove itself free of fault, and thereby rebut this presumption, this Court does realize that other significant factors also contributed ultimately to cause the collision, and has evaluated the CAPTAIN VICK's liability in light of these additional factors.

On the day of the collision, there is no doubt that Special Mariner's Notice No. 1–74 was in effect, and that the day signals were hanging from the railroad bridge span. Cast in considerable doubt, however, is whether downbound traffic could actually see the day signals because of the visual obstruction caused by the recent construction of the top span of the new Highway 90 bridge. Captain Spikes testified that the day signals were never visible to him until he passed under the new Highway 90 bridge; no witness or evidence contradicted this statement.

While the Court must agree that the visual aids may have very well been blocked from vision by the new highway bridge span, it cannot simply overlook the captain's inaction in failing to make an attempt to see if the restrictions were indeed in force. Surely the captain recognized the fact that the day signals might have been on the railroad bridge even though obscured from vision by the Highway 90 bridges. To assume that they were not there because the captain could not see the railroad bridge span is certainly an effort at convenience but not at reasonable conduct.

■ Captain Spikes acknowledged that he was aware of the very factors that would impose a duty on a mariner to inquire further about the Notice to Mariners. Captain Spikes related the following: (1) that he knew that the river current was running fast; (2) that he was aware that the Notice to Mariners would be imposed on vessels navigating the bridge openings when the current was swift, making navigation increasingly hazardous; and (3) that he well knew that the bridge tender and a Coast Guard vessel moored in the vicinity of the bridges could tell him whether the Notice was in effect. Under the known circumstances, the captain did not exercise the due care required of a person approaching a potentially hazardous area in the river. *Miller v. Semet-Solvay Division, Allied Chemical Corporation*, 406 F.2d 1037 (4th Cir. 1969); cert. denied 395 U.S. 921, 89 S.Ct. 1776, 23 L.Ed.2d 239.

But a more telling act of negligence on the part of Captain Spikes occurred as he was just coming abreast of the Conrad Shipyard. He was proceeding into the river bend under the mistaken belief, though created by the misrepresentations of both the bridge tender and Pilot Loupe of the CREOLE STAR, that the CREOLE STAR would be clear of the railroad bridge and possibly clear of all three bridge openings. To assure himself of the correctness of this expectation, Spikes placed a call to the CREOLE STAR. When the captain learned that the CREOLE STAR was still not in the railroad bridge opening, he was at a point in the river where he could have stopped his tow and reversed his direction, though with some difficulty. Since Captain Spikes stated at trial that he could still take effective evasive action while abreast of or above the Conrad Shipyard, the Court feels that it can attach substantial weight to this opinion since the captain, for all practical purposes, is an expert in river navigation with 17 years of experience as a captain.

■ Under objective conditions, Captain Spikes should have immediately reversed

his engines and attempted to bring the tow under control. He had the intuition to know that to proceed much further downstream would be increasing the risks of an accident since the tow would be committed to a run on the bridge openings. As expressed in testimony, Captain Spikes was acutely aware of the considerable risk of danger incurred when two tows attempted passage within the bridge openings. Furthermore, Spikes should have realized, and indeed appeared to realize, as demonstrated by his alarmed response to Captain Dupre's statement of the CREOLE STAR's position, that both tows would be in the bridge openings at the same time if the CREOLE STAR were just at the point of putting her nose in the bridge. In balancing the gravity of the risks against the consequences of taking safety precautions, there appears little question that Captain Spikes should have stopped his tow and taken timely evasive action. *Miller, supra; Union Oil Company of California v. M/V Issaquena*, 470 F.2d 875 (5th Cir. 1973); 1973 A.M.C. 493.

Yet Captain Spikes elected instead to continue downriver and into its middle so that he could first view the CREOLE STAR before deciding the necessity of any evasive action. In hindsight, this action was an unreasonable gamble since it is now clear that given the location and speed of the CREOLE STAR at the time of communication, Captain Spikes had no other way to avoid meeting the CREOLE STAR in the bridge openings once he continued forward other than by the very action he finally took at a point of no return.

Perhaps Captain Spikes felt that he could still take effective evasive action even after he had passed the Conrad Point. But other than this possible factor, one dominant consideration influencing his decision to continue forward was his unwillingness to believe the representation made by Captain Dupre. Because of the captain's incredulity, he wanted to first sight the CREOLE STAR before deciding on his course of action. The earlier combined misrepresentations of the bridge tender and the CREOLE STAR weighed heavily on the captain's unwillingness to act objectively. Though Captain Spikes' conduct was a serious breach of a mariner's duty of prudent seamanship, the earlier conduct of the other two parties cannot be dismissed as being unrelated and detached from the cause of the collision.

## NEGLIGENCE OF THE CREOLE STAR

Clear and decisive communication between the two vessels was the ultimate requirement for coordinating and safely achieving passage through the three bridge openings, an admittedly hazardous undertaking. Pilot Loupe of the CREOLE STAR faltered drastically in maintaining full and sufficient communication with the CAPTAIN VICK. From the time of his first conversations relative to navigating through the bridges, Pilot Loupe was under the false impression that the CAPTAIN VICK was much farther from the railroad bridge than she really was. This confusion over the CAPTAIN VICK's position continued up to the time that Captain Spikes engaged Captain Dupre in conversation. As Dupre testified, Pilot Loupe had erroneously informed him shortly before the conversation that the CAPTAIN VICK was still in the Port Allen route, when, in fact, she was just approaching the Conrad Shipyard.

This erroneous impression maintained by Loupe apparently lulled the pilot into a false sense of security. He obviously felt that safe navigation could be made through the bridge openings without much effort on his part of informing the CAPTAIN VICK at certain intervals of the CREOLE STAR's position to the bridge, and of any changes in her navigational approach or speed that might affect safe navigation. In fact, after Pilot Loupe's conversation with the JAVELINA and the bridge tender, while the CREOLE STAR was still below One Arm Landing, he initiated no other conversations with either the bridge or the CAPTAIN VICK.

When the CAPTAIN VICK inquired about the CREOLE STAR's position, Pilot Loupe responded with the ambiguous and clearly misleading statement that "I'll be

ready to stick my nose in the bridge." In truth, the CREOLE STAR was more than 600 yards from the railroad bridge, and had several minutes before that conversation, reduced her speed drastically to allow the vessel CORINA to navigate into the Intracoastal Canal. Even though Pilot Loupe continued to maintain this reduced speed for some length of time in anticipation of an unidentified vessel's traversing his navigational line so as to enter the Atchafalaya River from the Intracoastal Canal, Loupe never made the effort to communicate to the CAPTAIN VICK that there would be a delay in his approach to the railroad bridge.

So when Captain Spikes was first told by Captain Dupre that the CREOLE STAR was just putting her nose in the bridge, he had no earlier information by which to verify the later statement of position. Possessed with only the information related by the two vague misstatements of position, and without knowledge of the CREOLE STAR's reduction of speed in approaching the bridge, Captain Spikes only had information that would refute the latest statement by Captain Dupre. With predictable disbelief, Captain Spikes decided to proceed forward to sight the CREOLE STAR and thereby reconcile the inconsistencies.

Pilot Loupe's negligent conduct in failing to maintain adequate radio contact or to correctly state his location contributed to Captain Spikes' decision to continue on below Conrad Point. Pilot Loupe failed to conduct his duties as a pilot with the prudence required of a mariner. *Miller, supra.*

As defendant A–Line Towing Company contends, the CREOLE STAR did not yield the right of way to the downbound CAPTAIN VICK. Under the circumstances, however, this Court does not find that the vessel violated the Notice to Mariners. Though the Notice was issued in the spirit of enhancing safe passage through the bridge openings, an end that the vessels failed to achieve, an upbound vessel under the Notice was only compelled to yield when two vessels were about to enter the openings from opposite directions at the same time. ¶ 10, Local Notice to Mariners No. 1–74.

Though this Court does not wish to leave the impression that mathematical exactitude should be considered in deciding whether a vessel has abided by the spirit of a "navigational safety" statute, it must here conclude that the CREOLE STAR was in the bridge before the CAPTAIN VICK even started backing at a point just under a mile from the old Highway 90 bridge. Having arrived at the bridge opening before the CAPTAIN VICK, the CREOLE STAR did not violate the letter of the regulation when it proceeded through without yielding. Though the CREOLE STAR should have taken precautionary steps prior to arriving at a position within the fender system of the bridge, once in that position, she could not have backed down her gas-loaded barge without endangering the safety of her crew.

█ It is uncontested that the CREOLE STAR had no lookout at the time of passage through the bridge openings. The failure to maintain a lookout is a statutory fault which imposes on the guilty vessel the burden of proving not only that her failure to maintain such a lookout did not contribute, but that it could not have contributed to the collision. 33 U.S.C. 221, *Taylor v. M/V Tiburon,* 1975 A.M.C. 1229 (E.D.La.1974); *The Pennsylvania, supra.* Even under the heavy burden of the *Pennsylvania* rule, the CREOLE STAR can avoid any ultimate liability arising from this statutory fault. As amply demonstrated, at the time that the CREOLE STAR was entering the railroad bridge draw, the CAPTAIN VICK and her tow would not have been visible to a proper lookout since the tow was still obscured by the Conrad Shipyard. The failure to provide a lookout could not have possibly contributed to the collision, or changed any of the unfortunate events of the morning.

█ Though not liable for any statutory or regulatory fault, the CREOLE STAR must be found responsible for the collision to some extent based on the negligent actions of her pilot in transmitting erroneous positions and failing to maintain adequate

and effective radio contact with the CAPTAIN VICK.

### NEGLIGENCE OF SOUTHERN PACIFIC RAILROAD

 It has been consistently held that the right to navigate is paramount to the right to maintain bridges over water bodies, and for this reason courts have considered bridges as obstructions to navigation. *St. Louis-San Francisco Railroad Co. v. D. Mark*, 243 F.Supp. 689 (S.D.Ala.1965), 1965 A.M.C. 2106. Thus, owners of bridges are burdened with the responsibility of providing competent personnel on such bridges to insure proper operation. *Taylor, supra.* Furthermore, as bridge tenders, the individuals must bear the burden for coordinating water traffic and communicating with approaching vessels in an attempt to avoid accidents or collisions. 33 C.F.R. 117.1, *Taylor, supra.*

 As clear from the evidence, bridge tender St. Marie did not use the ordinary care required of him in communicating with the vessels and coordinating the water traffic. In effect, his communications did not serve to avoid a collision, but were a contributing factor in causing the collision between the CAPTAIN VICK and the railroad bridge. Though this Court certainly recognizes that a bridge tender cannot be in minute-by-minute contact with all river traffic in an attempt to coordinate safe passage through the drawbridge, especially where the vessels have themselves taken the initiative to coordinate their safe passage, the bridge tender is certainly responsible for intervening when he recognizes that possible danger of collision may arise out of the arranged passage. *Taylor, supra.* But furthermore, when a vessel solicits from the bridge tender specific information about navigation through the bridge, then, of course, the bridge tender must accurately provide an answer, or where unable to do so, must not rely on inaccurate speculation. Certainly the bridge tender should have been prepared to field questions by approaching vessels about marine traffic since the Local Notice to Mariners stated that the bridge tender of the Southern Pacific railroad bridge would be available on Channels 13 and 16 for information regarding the lift span and the marine traffic in the vicinity of the bridge. ¶ 12, Local Notice to Mariners No. 1–74.

While the CAPTAIN VICK was still in the Port Allen route, Captain Spikes called the bridge to find out the location of the CREOLE STAR and to get reassurance that the CREOLE STAR would be clear of the railroad bridge once Spikes committed himself to an approach. As previously stated, at the time of this conversation, the CREOLE STAR was more than 600 yards below the bridge and approaching at a slow rate of speed. The bridge tender did not know the exact location of the CAPTAIN VICK nor was he aware of the speed at which the CAPTAIN VICK was approaching the railroad bridge.

Under these circumstances, the bridge tender told Captain Spikes that the CREOLE STAR was "just fixing on coming now." When asked if the CREOLE STAR would have plenty of time to come through the railroad bridge, the bridge tender stated: "Oh, yes, he should have, yes."

 First, the Court must conclude that the bridge tender did misrepresent the true location of the CREOLE STAR, leaving Captain Spikes with the impression that the vessel would be entering the bridge opening with little delay. Second, the bridge tender represented that the CREOLE STAR would have plenty of time to pass through the bridge, without asking Captain Spikes how long it would take him to reach the bridge. In coordinating water traffic and making representations as to the projected time of passage of a vessel, the bridge tender cannot always rely solely on his intuition. Where he chooses to respond to such a request by a pilot of a vessel, he must seek available data to make his judgment accurate, or explain to the requesting vessel the limitations of his representation. Bridge tender St. Marie certainly fell far below that standard of care and diligence required of an individual with the responsibility of coordinating traffic and communicating

with vessels in an effort to reduce the risk of accident or collision.

These misrepresentations and speculative statements served to corroborate the misstatement of position made by the CREOLE STAR to the CAPTAIN VICK. Captain Spikes had been consistently misinformed, in effect, that the CREOLE STAR would be clear of the railroad bridge when the CAPTAIN VICK made its run at the bridge. Based substantially on these corroborating misrepresentations, Captain Spikes did not react immediately to Captain Dupre's statement that the CREOLE STAR was just entering the bridge, but continued down river.

█ Based on the lack of care taken by the bridge tender in communicating information crucial to safe coordination of navigation through the railroad bridge, the Court concludes that the bridge tender, and thus the owner of the bridge, Southern Pacific Railroad Company, was negligent in violating the duties imposed under statute. 33 C.F.R. 117.1, *Taylor, supra.* The bridge owner's violation of the statute renders the *Pennsylvania* rule applicable, establishing a strong presumption of liability that the bridge owner has not overcome.

### COMPARATIVE NEGLIGENCE

█ Having found the CAPTAIN VICK, the CREOLE STAR, and the Southern Pacific Railroad Company at fault, and that the fault of each was a cause of the accident, the Court must apportion liability in accordance with each party's degree of fault. *Reliable Transfer Co., Inc., supra.* The Court determines that the liability for this collision should be assigned fifty percent (50%) to the CAPTAIN VICK, twenty-five percent (25%) each to the CREOLE STAR and Southern Pacific Railroad Company. All parties failed to maintain the proper communications with each other required to coordinate water traffic through hazardous bridge openings. Captain Spikes of the CAPTAIN VICK made no effort to determine if the Notice to Mariners was in effect, even though he was aware that the day signal might be obscured by the span of the new highway bridge. Because he failed to make inquiry about the imposition of the Notice to Mariners Captain Spikes continued to push his non-integrated three-barge tow into the bridge opening vicinity, thereby significantly increasing the already existing hazardous conditions involved in navigating through the bridges. Though Spikes was in the position to take timely evasive action upon learning that the CREOLE STAR was just putting her nose in the bridge, he went against his better judgment and the duty that prudence demanded of mariners when he continued his navigation to a point in the river where he could no longer take action to avoid a collision with the railroad bridge.

The CREOLE STAR and the bridge tender were not blameless. By making corroborative misrepresentations of the CREOLE STAR's position, and by failing to correct these misstatements, these two parties planted an unshakable misimpression in the mind of Captain Spikes. While the Court does conclude that Captain Spikes was substantially at fault for disregarding his duty to take evasive action, notwithstanding his confused state of mind, it must find that the captain had some justification for not believing Captain Dupre's statement of position on its face.

### DAMAGES

The Court concludes that bids were properly let, and that the plaintiff received a reasonable bid price for the reconstruction of the damaged pilings caused by the impact from the CAPTAIN VICK. Furthermore, as evidenced by the plans submitted by Southern Pacific Railroad Company in September of 1971 for the repair of the northwest dolphin, the Coast Guard was fully apprised of the proposed construction of pipe pilings around this dolphin and gave its approval. Thus, the fender system of the railroad bridge was properly constructed and maintained as of July 14, 1974. The total cost of repairs of the piling damage on the northwest and southeast dolphins caused by the CAPTAIN VICK's tow, amounts to $73,756.00.

738

This Court follows the rule that in admiralty collision cases, prejudgment interest should be allowed as a matter of course, except where peculiar circumstances warrant an award only from the date of judgment. *Mobil Oil Corp. v. Tug Pensacola,* 472 F.2d 1175 (5th Cir. 1973). The Court's conclusion that the plaintiff was 25% responsible for the accident does not reach the threshold of such a peculiar circumstance. *Sinclair Refining Co. v. S/S Green Island,* 426 F.2d 260 (5th Cir. 1970).

Accordingly, the Court ORDERS that A–Line Towing Company and LeBeouf Bros. Towing Company, as defendants in this case, be cast in judgment for their proportionate share of the damages and for interest on their respective share accruing from the date of the accident.