Clifton L. DAVIS

v.

SUPERIOR OIL COMPANY, in person-
am M/V COALINGA, Her Engines,
Tackle, Apparel, etc., in rem.

Civ. A. No. 79–156.

United States District Court,
E. D. Louisiana.

April 14, 1981.

David B. Lawton, Terriberry, Carroll,
Yancey & Farrell, New Orleans, La., for
plaintiff.

S. Gene Fendler, Liskow & Lewis, New
Orleans, La., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK M. GORDON, District Judge.

Plaintiff, Clifton L. Davis, filed this law-
suit against Superior Oil Company (herein-
after "Superior"), in personam, and against
the M/V COALINGA (hereinafter "COA-
LINGA"), in rem, for damages resulting
from a June 1, 1978 allision in the Gulf of
Mexico. Superior filed a counterclaim
against Mr. Davis for damages arising out
of the same incident. Plaintiff previously
having recovered damages, the October 23,
1980 trial was held solely on the liability
issue.

Having reviewed the evidence, the memo-
randa of counsel, and the applicable law,
the Court now makes the following findings
of fact and conclusions of law.

### FINDINGS OF FACT

1.

At all times pertinent to this case, plain-
tiff was the owner and operator of the F/V

JET SET (hereinafter "JET SET"). This wooden hull shrimping trawler measured 62.2 feet.

### 2.

At all times pertinent to this case, Superior was the owner and operator of the COALINGA. This four-year-old crew boat carried passengers for hire and measured approximately 78 feet. Two V16 GM diesel engines powered this vessel.

### 3.

On June 1, 1978, the JET SET was anchored below Fresh Water Bayou in the Vermilion Block area of the Gulf of Mexico. Captain James Miles, Brenda Miles, Deckhand Rufus Jones, and Betty Jones were aboard the JET SET. At approximately 10:00 p. m. the vessel dropped anchor; at approximately 11:00 p. m., the aforementioned persons retired to their cabins.

### 4.

Captain Douglas Reese, a licensed master, and Mr. Ludrick Schexnider, the vessel's engineer, comprised the COALINGA's crew on June 1, 1978. At approximately 11:00 p. m. that date the COALINGA departed Vermilion Block 76 carrying several contract personnel who had worked on a neighboring Superior producing facility.

The vessel was proceeding in a northeasterly direction. At approximately 11:25 p. m., after travelling eight to ten miles, the COALINGA rammed broadside into the JET SET. The night was moonless with a visibility estimation of approximately six to eight miles. The seas were running at two to three feet.

### 5.

The evidence conflicts regarding the JET SET's actual illumination upon the accident's occurrence and the lighting's wiring system. The question of the vessel's adherence to lighting requirements is significant.

The JET SET's controverted lighting arrangement consisted of: a single green light on top of the mast and a white light forward of the mast and a white light aft of the mast. These two white mast lights were positioned several feet below the top. Neither one met the requirements of a 360° ("all-round") light. Captain Miles testified that the top green light was burned out prior to the accident. He stated that in executing his responsibility to turn the lights on, he illuminated one white light before going to bed—while the JET SET lay at anchor. At trial, Captain Miles could not remember which mast light he had illuminated. The statement made to the Coast Guard 18 hours after the accident indicated that Captain Miles thought the rear light was on—this statement's accuracy affirmed to the best of his knowledge when read at trial. His deposition testimony, however, revealed that he believed the front light was illuminated.

Regarding the lights' wiring, Captain Miles testified that one switch on the control console turned on one mast light and the top light, while the other switch turned on the other mast light. These off-on switches were labelled "mast light" and "trawl light." Captain Miles' trial testimony indicated his ignorance as to which switch controlled which light. At his deposition, however, Captain Miles stated that the mast light switch operated the green light and the rear white light; the trawl light switch thus controlled the front light. The deposition testimony, brought out during cross-examination, further revealed that Captain Miles had turned on the trawl light switch, illuminating the front light.

Rufus Jones, the JET SET deckhand, testified that one switch controlled both white mast lights. He recalled seeing only the front light illuminated on the night of the accident, stating that the back light had apparently burned out. Yet this conflicts with Captain Miles' reason for not turning on both lights; he stated that he used only one light in order to save battery power. Mr. Davis confirmed Mr. Jones' testimony by stating that the two white lights were controlled by one switch while the other switch turned on the top light. Mr. Davis further testified that the electrician had reversed the wiring in the control console, explaining that the switch marked trawl lights turned on the mast lights and the switch marked mast light controlled the top green light.

Captain Miles referred to the white mast lights as the "anchor lights" and to the green light as the "trawl light" as does plaintiff's exhibit No. 1. In his deposition, Captain Miles, responding to questioning regarding the purpose of the green light at the top of the mast, stated that it could be used for several functions. One such use, he testified, was to put a white globe on it as an anchor light. He testified that any colored globe could be utilized. While Captain Miles had previously used the top light as an anchor light, he stated that he was not so using it on the voyage in question. Rather, he used one of the mast lights as an anchor light. He stated his belief that the mast light was functioning as an anchor light on the night of the accident. This testimony reveals Captain Miles' lack of understanding regarding execution of the specific requirements for anchor lights.

### 6.

Neither mast light was burning following the collision. Captain Miles stated that the switch that had been positioned "on" remained so until he turned it off after reaching the Freeport shipyard.

The Coast Guard investigated the collision on the morning following the accident. These investigators were able to illuminate the rear light, while the forward light, its lit state having been attested to by Captain Miles' deposition testimony and by Mr. Jones, would not come on. This forward light was removed by the Coast Guard investigator, thrown overboard from the top of the mast (approximately 20 feet), and subsequently retrieved by a Superior investigator for examination purposes.

### 7.

The light bulb in question has undergone testing to prove Superior's contention that the bulb had *previously* burned out and was not broken as a result of the collision. Supporting their argument, Superior introduced Mr. Alvin Doyle, Jr., who testified on the electrical composition of light bulbs. Mr. Doyle's examination revealed that the filament had been shattered into six pieces and that the envelope was discolored from evaporation, the latter finding reinforced

by the tungsten deposit on the envelope, all of which indicated that the bulb had burned out prior to the accident. He testified that the bulb was in "cold shock," causing the filament's brittleness. Because of the brittle state, Mr. Doyle opined that the filament breakage resulted from the impact when the bulb hit the water as opposed to the force of the accident. He contrasted this to an illuminated bulb's condition, indicating that its heat would have caused the filament's pliability.

### 8.

Mr. Leonard C. Adams presented results of tests he had performed at the behest of the plaintiff. Upon his visual inspection of the bulbs in question, Mr. Adams found bending of the *filament support posts,* upon which he based his opinion that this bulb would have been illuminated at the accident time. He was unable to state, however, that the loose *filament* in the bulb supported a conclusion that the bulb had been burning at the time of the COALINGA's impact.

With a supply of new light bulbs, Mr. Adams performed acceleration and impact tests to reconstruct these forces' effects on a bulb. He never measured the precise amount of force used and only presumed that the similar bending of the filament posts resulted from a similar impact. Despite Mr. Adams' attempts to duplicate the accident, the Court cannot find that his experiments can establish that the bulb was shattered by the impact of the collision and had been previously burning. This is in view of Mr. Adams' exclusive use of cold bulbs, the distinction between a bulb's filament and its filament support posts, the latter which do not burn, and testimony that support wires can be bent in shipment or in the manufacturing process.

### 9.

The COALINGA's radar was inoperative on the night of the accident. Captain Reese testified that on such a clear night, radar provides no additional navigational aid. Having been broken for approximately two weeks, requests had been submitted for its repair.

**10.**

The Coast Guard certificate of inspection for the COALINGA requires a crew of one ocean operator and two deckhands when operating within the pertinent time period. On June 1, 1978, the crew consisted of one operator and one deckhand.

Mr. Schexnider was not functioning as a lookout on the COALINGA. During the entire evening of the accident, he remained in the wheelhouse while Captain Reese steered. Neither gentleman saw any lights directly in their path; upon sight of the JET SET just prior to hitting it, Captain Reese reversed the COALINGA.

**11.**

Captain Reese and Mr. Schexnider stated that they saw no shrimpboats or fishing boats on the night of the accident. Both gentlemen were looking ahead and viewed lights only from the oil platforms and structures. The COALINGA crew did not equate travelling at approximately 20–23 m.p.h., which is maximum speed, on this clear night with no visible structures or boats in close proximity with negligent or excessively fast vessel operation.

### CONCLUSIONS OF LAW

**I.**

The Court exercises jurisdiction over this case pursuant to its Admiralty and Maritime authority. 28 U.S.C. § 1331. In this allision case the Court is guided by the admiralty law precepts of *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975) and The International Rules of the Road, 33 U.S.C. § 1602 (hereinafter "International Rules").

**II.**

The heavy burden imposed on the party shown to be statutorily at fault in a collision case, *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874), has been

tempered by the equitable overlay of *Reliable Transfer, supra.* It is now well-settled that liability for property damages sustained in a maritime collision is allocated according to the degree of the parties' comparative fault. *Valley Towing Service, Inc. v. S/S AMERICAN WHEAT Freighters, Inc.*, 618 F.2d 341 (5th Cir. 1980); *Portacci v. Moran Towing and Transportation Co.*, 615 F.2d 293 (5th Cir. 1980). The Supreme Court's *Reliable Transfer* decision rejected the already-eroding divided damages rule, maintaining the caveat that situations of equal fault or no possible measurement of comparative degrees of fault would mandate equal allocation of damages.

**III.**

Yet the Pennsylvania rule continues to exist. The rule imposes on a party statutorily at fault the burden of showing that its fault did not cause the collision *and* that it *could not* have caused the collision. Such a cumbersome presumption of causation has been described by this Court as "... unnecessary, inequitable, and ineffective in accomplishing its original design; like the divided damages rule, it should be abolished, or at least the burden of rebuttal must be reduced." *Southern Pacific Transportation Co. v. The Tug Captain Vick*, 443 F.Supp. 722, 732 n. 1 (E.D.La.1977). Nevertheless, the Court of Appeals for the Fifth Circuit recently affirmed the Pennsylvania rule's expanded application to a bridge-vessel allision and held that the rule survived the *Reliable Transfer* decision. "The proportional liability rule announced in *Reliable Transfer* does not render unnecessary consideration of the Pennsylvania rule." *Florida East Coast Railway Co. v. Revilo Corp.*, 637 F.2d 1060 p. 1067 (5th Cir. 1981).[1] Thus, a determination of the parties' liability involves an assessment of their degrees of fault attributable to the accident—against the looming Pennsylvania rule.

1. This Court finds quite curious the Fifth Circuit's citation of *Southern Pacific Transportation Co. v. The Tug Captain Vick* as its sole support of the Pennsylvania rule's continued viability. While *bound* to apply the Pennsylvania rule, this Court in *Southern Pacific Transportation* welcomed the alleviation afforded by the *Reliable Transfer* decision and severely criticized the inflexible and caustic Pennsylvania presumption of causation.

## IV.

The instant case is indicative of the anomalous possibilities resulting from adherence to the Pennsylvania rule. That is, since the JET SET *and* the COALINGA have violated statutory directives, both parties must rebut the presumptions placed upon them and show that such fault did not and could not have caused the allision.

██ The Court is mindful of the additional presumption whereby the moving vessel that collides with an anchored vessel is presumed to be at fault. *The Oregon,* 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943 (1894); *Skidmore v. Grueninger,* 506 F.2d 716, 721 (5th Cir. 1975). The plaintiff cannot avail himself of this presumption, however, as the JET SET cannot make the requisite showing that it was anchored and lighted in accordance with statutory rules intended to prevent collision. *Gaspar v. U.*

S., 460 F.Supp. 656 (D.Mass.1978); *Skidmore v. Grueninger, supra; Rogers v. Saeger,* 247 F.2d 758 (10th Cir. 1957); *Willis v. Tugs Tramp and Mars,* 216 F.Supp. 901 (E.D.Va.1962); *Walter G. Hougland, Inc. v. The M/V Carport,* 194 F.Supp. 723 (E.D.La. 1961). Moreover, the Court recognizes that this case's disposition involves evaluation of additional factors.

## V.

██ Rules 26 and 30 of the International Rules provide the standards for a vessel's lighting arrangement, whether underway or anchored.[2] The JET SET nowhere exhibited an "all-round" light in compliance with these statutory directives. Indeed, Captain Miles' testimony revealed his ignorance of anchor light requirements (finding of fact No. 5).

2. These Rules provide:

Rule 26. Fishing vessels

(a) A vessel engaged in fishing, whether underway or at anchor, shall exhibit only the lights and shapes prescribed in this Rule.

(b) A vessel when engaged in trawling, by which is meant the dragging through the water of a dredge net or other apparatus used as a fishing appliance, shall exhibit:

(i) Two all-round lights in a vertical line, the upper being green and the lower white, or a shape consisting of two cones with their apexes together in a vertical line one above the other; a vessel of less than 20 metres in length may instead of this shape exhibit a basket;

(ii) A masthead light abaft of and higher than the all-round green light; a vessel of less than 50 metres in length shall not be obliged to exhibit such a light but may do so;

(iii) When making way through the water, in addition to the lights prescribed in this paragraph, sidelights and a sternlight.

(c) A vessel engaged in fishing, other than trawling, shall exhibit:

(i) Two all-round lights in a vertical line, the upper being red and the lower white, or a shape consisting of two cones with apexes together in a vertical line one above the other; a vessel of less than 20 metres in length may instead of this shape exhibit a basket;

(ii) When there is outlying gear extending more than 150 metres horizontally from the vessel, an all-round white light or a cone apex upwards in the direction of the gear;

(iii) When making way through the water, in addition to the lights prescribed in this paragraph, sidelights and a sternlight.

(d) A vessel engaged in fishing in close proximity to other vessels engaged in fishing may exhibit the additional signals described in Annex II to these Regulations.

(e) A vessel when not engaged in fishing shall not exhibit the lights or shapes prescribed in this Rule, but only those prescribed for a vessel of her length.

Rule 30. Anchored vessels and vessels aground

(a) A vessel at anchor shall exhibit where it can best be seen:

(i) In the fore part, an all-round white light or one ball;

(ii) At or near the stern and at a lower level than the light prescribed in sub-paragraph (i), an all-round white light.

(b) A vessel of less than 50 metres in length may exhibit an all-round white light where it can best be seen instead of the lights prescribed in paragraph (a) of this Rule.

(c) A vessel at anchor may, and a vessel of 100 metres and more in length shall, also use the available working or equivalent lights to illuminate her decks.

(d) A vessel aground shall exhibit the lights prescribed in paragraph (a) or (b) of this Rule and in addition, where they can best be seen:

(i) Two all-round red lights in a vertical line;

(ii) Three balls in a vertical line.

(e) A vessel of less than 7 metres in length, when at anchor or aground, not in or near a narrow channel fairway or anchorage, or where other vessels normally navigate, shall not be required to exhibit the lights or shapes prescribed in paragraphs (a), (b) or (d) of this Rule.

Plaintiff has not shown that this failure could not have caused the accident, *The Pennsylvania,* in view of the conflicting testimony concerning the "substitute" anchor light. That is, the plaintiff's negligence has been shown through the confusion regarding which light was illuminated, the wiring system, and the absence of affirmative testimony from the COALINGA crew indicating that a light actually was burning. In view of the clear nighttime conditions, while still mindful of the COALINGA's negligence, the Court finds that the JET SET's improper lighting arrangement bears a significant causal relationship to the accident.

## VI.

The COALINGA's failure to maintain a lookout constitutes a violation of Rule 5, International Rules.[3] This statutory transgression imposes upon Superior the burden to show that the absence of a lookout did not, and could not have, contributed to the collision. *Southern Pacific Transportation Co. v. The Tug Captain Vick, supra; The Pennsylvania, supra.* Mr. Schexnider stated that he and Captain Reese were looking ahead just prior to the accident and saw no lights. Yet the Court cannot engage in the speculation necessary to support a finding that the presence of a designated lookout could have averted the accident.

The COALINGA's deficiency in manning violated its Coast Guard certificate. Indeed, Captain Reese's ignorance regarding the requirement for two deckhands, in view of his testimony that his Superior supervisor had approved operation with one deckhand, factors into the Court's analysis of the vessel's operation.

## VII.

There is no statutory requirement mandating radar equipment. The failure to repair inoperative radar has not been equated with fault. In a determination of a vessel's seaworthiness, the court in *General*

*Cocoa Company v. The SS LINDENBANK,* 1979 AMC 283, 296 (S.D.N.Y.1978) made the following pertinent statement:

Custom or trade practice, however, is not determinative with regard to radar, for although most modern ships are now equipped with radar, there is currently no statutory requirement that a ship be fitted with radar to be seaworthy and no cases have yet held that the lack of radar makes a vessel unseaworthy. Gilmore and Black at 512; see *The Bergechief,* supra 1960 AMC 1380, 274 F.2d at 474. Since radar is not required for seaworthiness, it would appear to follow that a ship is not unseaworthy because it proceeds to sea without making repairs of the radar equipment on board. See Healy, Radar and the New Collision Regulations, 37 Tulane L.Rev. 621, 631–632 (1963). Plaintiff has cited no case holding a vessel unseaworthy for failure to repair existing radar equipment prior to a voyage.

In commenting upon the then newly-promulgated International Rules, Gilmore and Black stated:

On the closely connected question whether it is a fault under the law to fail to maintain radar equipment properly, the case law still leaves the matter doubtful. Professor Healy suggests a distinction between major repairs (failure to make which he would classify as equivalent to not having radar at all, and hence not a "fault" until the possession of radar is required) and repairs performable en route by the crew (failure to make which he would classify with failure to use radar properly; . . .) Gilmore and Black, The Law of Admiralty Ch. VII, p. 513 (2d Ed. 1975).

Though not a statutory or regulatory violation, the fact of inoperative radar cannot be divorced from an adjudication of culpability in a maritime allision. Certainly a component part of a vessel's navigational system represents a consideration in assessment of a vessel's management and operation.

---

3. Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the pre-

vailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision.

## VIII.

Rule 6 of the International Rules sets forth the factors determinative of a vessel's safe speed, relative to the prevailing circumstances and conditions, in order to avoid collision. Among these factors are:

(i) the state of visibility;

(ii) the traffic density including concentrations of fishing vessels or any other vessels;

(iii) the maneuverability of the vessel with special reference to stopping distance and turning ability in the prevailing conditions;

(iv) at night the presence of background light such as from shore lights or from back scatter of her own lights;

(v) the state of wind, sea and current, and the proximity of a navigational hazard.

Prior to the accident, the COALINGA proceeded at its maximum rate of speed. The Court cannot find that the COALINGA's speed was excessive as the vessel gauged its speed in response to the conditions of the night in question (finding of fact No. 4) and not seeing lights that would have indicated other vessels' close proximity. Yet to the extent that speed is an inherent factor in either the fact or the impact of an allision, it cannot be disregarded. The Court cannot foreclose the possibility that a speed reduction could have lessened the vessel's stopping time or reverse efforts.

## IX.

The Court finds that the JET SET and the COALINGA's fault contributed to the accident's cause. Accordingly, the Court must determine liability proportionate to each party's degree of fault. *Reliable Transfer, supra.* The Court assigns liability seventy percent (70%) to the JET SET and thirty percent (30%) to the COALINGA. The JET SET's failure to maintain a proper anchor light, coupled with the possibility of no illuminated light, takes on a critical significance in this nightime allision, rendering the Pennsylvania rule applicable, and thus establishing a strong presumption of liability that plaintiff has not overcome. The COALINGA's fault resulting from the absence of a lookout has similarly not been negated as a contributing cause of the accident. The COALINGA's inoperative radar, its deficient manning, and rate of speed, while not invoking the Pennsylvania rule, do comprise the totality of the vessel's operation, and as such, represent imperative considerations. Superior must bear its proportionate liability based on these additional acts and omissions for which, as a prudent navigator, the vessel owner is responsible.

Accordingly, the Court ORDERS that Clifton L. Davis and Superior Oil Company be cast in judgment for their proportionate share of the damage.