**ALAMO BARGE LINES, INC.**

v.

**RIM MARITIME CO., LTD. et al.**

**RIM MARITIME, K.K.**

v.

**ALAMO BARGE LINES, INC., et al.**

Civ. A. Nos. 83–2861, 83–2871.

United States District Court,
E.D. Louisiana.

Nov. 5, 1984.

---

W.J. Larzelere, Jr., New Orleans, La., for Alamo Barge Lines and Marine Equipment Co.

J. Dwight LeBlanc, Jr., New Orleans, La., for Rim Maritime, K.K.

Gary A. Hemphill, New Orleans, La., for intervenor Teh-Hu Cargocean Management Co.

William W. Westerfield, III, New Orleans, La., for intervenor Marathon Petroleum Co.

Lisa Devereaux Leach, New Orleans, La., for intervenor, Panama Transworld Leasing, SA.

CHARLES SCHWARTZ, Jr., District Judge.

This matter came on for non-jury trial on August 27 and 28, 1984, and after close of evidence, and the filing of post-trial memoranda by the parties, the Court took the matter under submission for further consideration. Now, after review of the record in this matter, the evidence adduced at trial, the memoranda of counsel, and the applicable law, the Court rules as follows.

To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any of the conclusions of law constitute findings of fact, they are so adopted.

## FINDINGS OF FACT

From the evidence and stipulations adduced at trial, the Court finds that Plaintiffs, Alamo Barge Lines, Inc. and Marine Equipment Co. (hereinafter "Alamo") are foreign corporations and are the respective operator and owner of the M/V PHILIP ARTHUR and the Barges ALAMO 7, 9, and 10.[1]

The M/T NORCHEM ("NORCHEM") is a small ocean-going chemical tank ship of conventional design, measuring 350 feet long and 7,339 gross tons. It is of Japanese registry, had a Japanese crew, and is owned by defendant, Rim Maritime, K.K., a Japanese company.

## I. The Allision

This matter stems from a maritime allision in the Mississippi River in the Baton Rouge area on June 6, 1983. On June 6, 1983, the NORCHEM arrived at the Baton Rouge general anchorage at approximately 0700 on June 6, 1983. Her compulsory pilot, Martin Gould, Jr., brought her to anchor in the upper portion of the Baton Rouge general anchorage, which lies along the west side of the Mississippi River between Miles 225.8 and 227.3, where the river is approximately 1400 feet wide. The NORCHEM was brought to anchor at approximately 0830 and was anchored astern of a 419-foot general cargo ship named ARBOREOUS, and upriver of a small cargo ship named NEPTUNE VOLANS.

The NORCHEM remained in place at anchor for about two hours, but at about 10:30 her captain and officers noted the ship to be dragging anchor downriver[2] towards the NEPTUNE VOLANS, anchored downstream. The captain placed the ship's engines ahead to attempt to ease the strain, but the NORCHEM continued to

1. The M/V PHILIP ARTHUR ("PHILIP ARTHUR") was a conventional twin-screw river towboat which was first constructed in 1956 and received substantial hull repairs in 1977. The PHILIP ARTHUR also had major repairs done after a collision and fire in 1979. It had two 450-horsepower D–397 Caterpillar diesel engines, for a total of 900 horsepower, was about 70 feet in length overall, with a breadth of 23 feet, had about 8.1 to 8.5 feet of hull depth, and a 3-to-1 reduction gear.

The Barges ALAMO 10, 9 and 7 are tank barges and on June 2, 1983, these barges were loaded with naptha, a flammable oil-based chemical, much like gasoline, and had a draft of between 9 and 9½ feet. These barges were en route from Texas to Garyville, Louisiana and were being pushed in a single line by the M/V PHILIP ARTHUR. The ALAMO 10 was the lead barge, the ALAMO 9 the middle barge, and ALAMO 7 the trailing barge. The entire length of the M/V PHILIP ARTHUR flotilla was about 690 feet.

2. At the time of this allision, the Mississippi River was at flood stage; the Bonnet Carre Spillway was opened completely, a flood-control measure very rarely taken and only during extremely high water. The New Orleans/Carrollton gauge was 17.2 feet above sea level and the Baton Rouge gauge at 43.7 feet above sea level. According to the testimony of Billy J. Garret on June 6, 1983, the mean surface current of the Mississippi River in the Baton Rouge, Louisiana area (at the Port Allen Lock) was estimated to be 6 miles per hour, with the maximum surface current estimated at 8–8.5 miles per hour.

drag. The captain, through charterer's agent, called for a pilot to re-anchor the ship.

The NORCHEM was re-anchored by Pilot Thomas Doyle at 13:12. After the anchors were secured, Pilot Doyle departed the ship (about 14:00). The NORCHEM'S second mate Kenji Ono ("Ono") plotted the new position of the NORCHEM by radar and gyro repeater from the bridge of the ship. Ono marked the location of the ship's bridge by a circled dot on U.S. Department of Commerce Chart No. 11370 ("ONO # 2"). The bow of the NORCHEM extended 80 meters upriver of the circled dot. The vessel remained anchored in this position until struck later by the 690-foot flotilla of the M/V PHILIP ARTHUR.

The ship's new position placed it outside the designated anchorage area for Baton Rouge, Louisiana.[3] The designated anchorage is shown on United States Department of Commerce Chart 11370 covering the Mississippi River, New Orleans to Baton Rouge, Louisiana. The upriver limit of the General Anchorage at Mile 227.3 is approximately one statute mile below the exit from the forebay of the Port Allen Lock. The NORCHEM'S position placed it less than one-half statute mile from the Port Allen Lock.

On June 6, 1983, the PHILIP ARTHUR pushing her three-barge tow entered the Port Allen Lock, located on the west bank of the river and above the anchored NORCHEM. James Talbert, relief captain of the PHILIP ARTHUR, was in the pilot house. The lock master of the Port Allen Lock told Talbert that the river "was running." He also advised Talbert of the height of the Baton Rouge gauge, 43.7 feet. Talbert had never entered the river from the Port Allen Lock when the river stage was this high and did not know what was the speed of current in the river.[4]

Later that afternoon, the PHILIP ARTHUR and her three-barge tow were released from the Port Allen Lock and were preparing to enter the river and proceed downriver to the Marathon Petroleum Dock. Before entering the river, Captain Talbert, checked with the United States Coast Guard VTS monitor for vessel traffic in the area and was told that the river was clear of traffic.

Talbert planned to bring the M/V PHILIP ARTHUR and tow out into the river by steering to his left as the tow exited the lock. He then planned to "drive" the tow out away from the west bank (i.e., head toward the east bank) before turning it downriver, so as to pass to the east, or starboard, side of the anchored ships. Talbert, however, did not properly execute this maneuver. Instead, Captain Talbert used a "hard left" rudder immediately after leaving the lock forebay; this caused the tug and tow to lose headway in its attempt to cross the river causing the flotilla to fall down with the current before crossing the river, forcing the flotilla to strike the port anchor chain of the anchored NORCHEM.

After striking the port anchor chain of the NORCHEM, the PHILIP ARTHUR filled with water and heeled to starboard. At 15:23, the remaining wires attaching her to the ALAMO 7 parted, and the tug rolled completely over to starboard and became awash. At this time, the port anchor chain of the NORCHEM, on which the PHILIP ARTHUR was apparently still caught, parted, and the PHILIP ARTHUR sank. The PHILIP ARTHUR has never been recovered.

This striking of the NORCHEM's port anchor chain by the PHILIP ARTHUR flotilla caused the NORCHEM to begin to drag downriver towards the ARBOREOUS. The NORCHEM came against the star-

---

3. The General Anchorage for vessels in the Baton Rouge Harbor extends between Miles 225.8 and 227.3 above the Head of Passes and measures 1,400 feet in width measured from the right descending bank of the Mississippi River. 33 C.F.R. § 110.195(a)(24) (1983).

4. Although the PHILIP ARTHUR had used helper boats during its transit of the Berwick Bridge area, as per government regulations, neither Talbert nor the permanent captain, Jerrell Oaks, asked for a helper boat to assist the PHILIP ARTHUR's tow while entering the Mississippi River from the Port Allen Lock.

board side of the ARBOREOUS, with the barges ALAMO 9 and ALAMO 7 between these two ships. Minor damage resulted to the ARBOREOUS when the NORCHEM made minor contact with the starboard side of that vessel after dragging her remaining starboard anchor. These barges eventually worked free of the two ships without loss of any of the volatile naptha cargo. The Barge ALAMO 10, either as a result of the initial collision or subsequent collisions with nearby barge fleets, suffered some damage and the loss of approximately 1273 barrels of naptha cargo, which fortunately did not ignite. The anchored NEPTUNE VOLANS was also damaged when struck by these drifting barges.

As a result of the allision, the NORCHEM incurred temporary repairs, anchor replacement costs, and permanent repair costs, as well as loss of vessel use and incidental expenses during the repairs and replacement. The value of these damages has been stipulated to be $107,608. The PHILIP ARTHUR was sunk and is a total loss. The Barge ALAMO 10 sustained $45,000 in damages. The value of the lost cargo, consigned to Marathon Petroleum Company, has been stipulated to be $43,307.80. Panama Transworld Leasing, S.A. and Teh-Hu Cargocean Management Co., Ltd., Hong Kong, respective owners of the NEPTUNE VOLANS and the ARBOREOUS have sustained damages of $25,000 and $2,979 as a result of the accident.

In determining liability for the allision, the Court finds that the pre-allision position of the NORCHEM, outside the General Anchorage, embarrassed the PHILIP ARTHUR's navigation. The same highwater and strong current conditions that presented problems for the NORCHEM in the general anchorage also presented problems for tugs and tows exiting the Port Allen Lock. In light of those conditions, the NORCHEM's mid-channel anchorage, with its extending bow anchor chain, constituted an obstruction to the navigation of river traffic exiting the Port Allen Lock and proceeding downriver. Further, the NORCHEM failed to notify the Port Captain, VTS, and/or personnel at the Port Allen

Lock of its position, outside of the designated anchorage for Baton Rouge.

The pre-allision position of the NORCHEM was such that pilot Talbert could not have seen the NORCHEM until he was well out of the forebay of the Port Allen Lock. The Court does not find the testimony of Mr. Frederick Denham to the contrary credible, and notes that no such line of vision appears from an examination of the photos taken from the NORCHEM's bridge during the accident.

Additionally, the Court finds that The 900-horse power PHILIP ARTHUR was underpowered for the task at hand, and could not adequately navigate in the high water and current conditions that existed on the day of the accident. Given those conditions, and the vessel's inadequate power, the PHILIP ARTHUR's captain and/or pilot should have requested and utilized helper boats to enter the river.

II. *The valuation of the PHILIP ARTHUR*

Evidence relating to valuation of the PHILIP ARTHUR at the time of its loss indicated that comparable sales of boats similar to the PHILIP ARTHUR sell anywhere from $140,000 to $395,000, with pushboat "for sale" listings ranging from $170,000 to $550,000. The market for pushboats can not accurately be ascertained at the date of the vessel's loss and accordingly, therefore, its valuation must be determined with reference to the additional factors. Relevant to this inquiry are: the sums spent to repair and refit the vessel in 1979 ($349,000) and 1977 ($634,000), as well as the vessel's condition, and the depreciated residual value of the PHILIP ARTHUR on June 6, 1983 ($348,292.71). At the date of the accident, the vessel was insured for $500,000, and estimated replacement costs were put between $360,000 and $400,000.

III. *The Cargo Claim*

Evidence was also presented with regard to the terms and conditions of the carriage of the naptha lost as a result of this allision. Mr. Dave Deeter of Marathon Petro-

leum Company ("Marathon") and Mr. Mike Malloy of Alamo Barge Lines ("Alamo") negotiated the terms of transport for the cargo of naptha carried on the barges AL-AMO 7, 9, 10 and pushed by the PHILIP ARTHUR on the day of this allision. Similar to their previous dealings over the preceeding two years, the parties negotiated via telephone. They discussed and agreed to the following terms and conditions for this carriage of naptha, from Marathon's Texas City, Texas refinery to its Garyville, Louisiana refinery:

1. The price for transporting the naptha;
2. The quantity of naptha to be transported;
3. The date and time for loading and discharging the naptha;
4. The lay time to be allowed the tow in Texas City and Garyville;
5. The demurrage rate per hour.

Mr. Malloy of Alamo then sent a document entitled "Barge Charter Party" (Plaintiff's Exhibit # 7) to Mr. Deeter at Marathon. On the front of this document, Mr. Malloy listed the terms and conditions discussed by and agreed to by the parties pursuant to their phone conversation. The back side of this document contained twelve additional terms and conditions. These included "boiler plate" clauses, specifically a both to blame clause in favor of the carrier, Alamo, as well as an insurance clause that operated to absolve Alamo from any liability to Marathon in the event of cargo loss. The testimony indicates that these twelve clauses were never discussed by the parties during their negotiations. Marathon did not sign the documents after they received them from Alamo, but simply "filed them away." During their negotiations, the parties never stated that their oral agreement was to be finalized and/or controlled by the previously undiscussed terms of the Barge Charter Party. It was the parties intent to be bound by the specific terms and conditions that were discussed during their phone negotiations, set forth on the front side of the Barge Charter Party signed and delivered by Alamo to Marathon. The evidence adduced at trial indicates that while Marathon did not ever express an intention not to be bound by the terms set forth on the reverse of the Barge Charter Party, they did not, within the preceeding two years, ever return a signed copy of the barge Charter Party to Alamo.

## CONCLUSIONS OF LAW

The Court exercises jurisdiction over this case pursuant to its Admiralty and Maritime Authority, 28 U.S.C. § 1331.

### I. *The Allision*

■ In this allision case, the Court is guided by the admiralty law precepts of *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), and thus aportions liability between the parties.

### A. *Alamo*

■ The PHILIP ARTHUR's insufficient horsepower for the task at hand and Captain Talbert's improper course and helm commands constituted unseaworthiness and negligence and were causes of the allision and resulting damage.

The 900 horsepower PHILIP ARTHUR was underpowered for the task at hand, and could not adequately navigate in the high water and current conditions that existed on the day of the accident. Given those conditions, and the vessel's inadequate power, the PHILIP ARTHUR's captain and/or pilot should have requested and utilized helper boats to enter the river from the Port Allen Lock.

Further, Captain Talbert's course and helm commands were additional causes of the allision. Captain Oaks and Charles Edwards were of the opinion that Captain Talbert's maneuver after exiting the Port Allen Locks was improper. They testified he should have set a course that directed him across the river to the Magnolia Docks; not one that pointed him upriver, as indicated by position "1" on Exhibit Talbert 1. The proper procedure according to the testimony of Oaks and Edwards would have been to drive almost straight across the

river with little or slight left rudder (to maintain headway), and then, after crossing the river, to fall down with the current and proceed downriver close to the east bank and clear of anchored ships in the area. Talbert's failure to properly execute this maneuver, coupled with his "hard left" rudder (an incorrect helm instruction), caused the vessel to get caught by the current before it crossed the river, sending it into an uncontrolled clockwise swing from which it eventually made contact with the port bow anchor chain of the NORCHEM.[5]

B. *Rim and NORCHEM*

 Rim and the NORCHEM are guilty of statutory violations in anchoring the NORCHEM. The anchorage, outside of the designated Baton Rouge zone, was in violation of 33 C.F.R. § 110.195(a)(24) (1983). The NORCHEM failed to sufficiently justify its illegal anchorage. Furthermore, its extreme midchannel position failed to comply with the provisions of 33 C.F.R. 110.195(c) (1983) governing emergency anchorage outside of the designated anchorage area for Baton Rouge. The NORCHEM's position, during the extreme water and current conditions present in the river on June 6, 1983 constituted a violation of 33 U.S.C. § 409, and 33 C.F.R. 110.-195(c), as its midchannel position and proximity to the Port Allen Lock created an obstruction to navigation for tugs and tows leaving the Port Allen Lock and heading downriver.

These violations place a heavy burden on Rim and the NORCHEM to show that this illegal anchorage did not and could not have caused the June 6, 1983 allision. *The PENNSYLVANIA,* 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874). However, this heavy burden has been "tempered by the equitable overlay of *Reliable Transfer" Davis v. Superior Oil Co.,* 510 F.Supp. 1162, 1165 (E.D.La.1981). Thus, liability for property damages sustained in this maritime collision must be allocated according to the degree of the parties' comparative fault, this is so even where one party is guilty of statutory violations. *Florida East Coast Ry. v. Revilo Corp.,* 637 F.2d 1060, 1066–67 (5th Cir.1981).

 The Court is also aware of the presumption of negligence that arises against a moving vessel when it strikes an anchored vessel. *The OREGON,* 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943 (1894); *Skidmore v. Grueninger,* 506 F.2d 716 (5th Cir.1975). However, since the NORCHEM was anchored in violation of the law, it cannot avail itself of this presumption. *Davis,* 510 F.Supp. at 1166 (and cases cited therein).

II. *The Valuation of the PHILIP ARTHUR*

In *Standard Oil Co. v. Southern Pacific Co.,* 268 U.S. 146, 156, 45 S.Ct. 465, 467, 69 L.Ed. 890 (1925), the Supreme Court articulated the law of damages as follows:

In case of total loss of a vessel, the measure of damages is its market value, if it has a market value, at the time of destruction.... Where there is no market value, such as is established by contemporaneous sales of like property in the way of *ordinary business,* as in the case of merchandise bought and sold in the market, other evidence is resorted to. The value of the vessel lost properly may be taken to be the sum which, considering all the circumstances, probably could have been obtained for her on the date of the collision; that is, the sum that in all probability would result from *fair negotiations between an owner willing to sell and a purchaser desiring to buy* .... And by numerous decisions of this Court, it is firmly established that the cost of reproduction as of the date of valuation constitutes evidence properly to be considered in the ascertainment of value.

*Id.* at 155–56, 45 S.Ct. at 466–67 (citations omitted) (emphasis added).

Subsequent cases have focused on the kinds of other evidence admissible when market value cannot be ascertained. In

---

5. *See* Positions "1–5" on Exhibit Talbert 1.

*Carl Sawyer, Inc. v. Poor,* 180 F.2d 962, 963 (5th Cir.1950), the Court listed the opinion of marine surveyors, engineers, the cost of reproduction less depreciation, the condition of repair which the vessel was in, and the uses to which it could be put and the amount of insurance on the vessel as factors to be taken into account in determining damages. *Bisso v. Inland Waterways Corp.,* 139 F.Supp. 387, 389 (E.D.La. 1956) held that capitalization of earning capacity and book value to the owner were properly considered by the Court as additional factors in determining damages. Furthermore, in *Greer v. United States,* 505 F.2d 90, 93 (5th Cir.1974), the Court stated that, "In situations where market value cannot readily be established, the Court should consider any and all evidence before it to establish a fair valuation." *See,* also, *King Fisher Marine Services, Inc. v. NP Sunbonnet,* 724 F.2d 1181, ("value to owner" considered a factor in determining damages), *reh'g denied,* 729 F.2d 315 (5th Cir.1984).

Under the facts of the case at bar, evidence was presented of comparable sales ranging from $140,000 to $395,000. Because the market for tug boats was severly depressed, the Court also questions whether these prices actually reflect what a "willing" buyer and seller would buy and sell for in an "ordinary market" situation. *See, Standard Oil,* 268 U.S. at 156, 45 S.Ct. at 467. Thus, market value, based on comparable sales appears difficult if not impossible to accurately ascertain. Given the applicable case law, it is proper for the Court to consider other factors in placing a value on the PHILIP ARTHUR. In properly compensating the owner of the tug for his loss, the following factors were considered by the Court:

1. At the time of the accident, the PHILIP ARTHUR was insured for $500,000.
2. The tug was built in 1956 and acquired by Alamo in 1970. It was refurbished in 1977 for $634,000 and 1979 for $349,000.
3. The book value of the tug at the time of the accident was $348,292.71.
4. Replacement costs were estimated at $360,000 to $400,000.
5. The condition of the vessel at the time of the accident.
6. The testimony of Mr. Ed Smith, president of Alamo that the PHILIP ARTHUR was a profitable tug, and that at the time of the accident, all of his vessels in the 900 HP range were working steadily.

In weighing these factors, it should be noted that "the ascertainment of value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts." *Standard Oil,* 268 U.S. at 156, 45 S.Ct. at 467. Therefore, in consideration of the factors mentioned above, the Court places the valuation of the PHILIP ARTHUR at the time her loss at $350,000.

III. *The Cargo Claim*

The Court also finds that an oral agreement was reached between Alamo and Marathon Petroleum Company ("Marathon"). The agreement provided that Alamo would transport Marathon's naptha from Texas City, Texas to Garyville, Louisiana. The terms agreed upon by Messrs. Molloy and Deeter for their respective principals were sufficient to form a maritime contract, without regard to its oral nature. *See, Kossick v. United Fruit Co.,* 365 U.S. 731, 734, 81 S.Ct. 886, 889, 6 L.Ed.2d 56 (1961); *Central Marine Service Co. v. Ocean Marine Contractors, Inc.,* 1984 AMC 1730, 1734 (5th Cir.1982) (per curiam) *Gardner v. M/V CALVERT,* 1958 AMC 800 (3d Cir.1958).

Since Marathon agreed to employ the entire capacity of the barges, the contract referred to above created a contract for private carriage and the parties' agreement formed a contract of affreightment. *Romano v. West India Fruit & S.S. Co.,* 151 F.2d 727 (5th Cir.1945); *Alamo Chemical Transportation Co. v. M/V OVERSEAS VALDES,* 469 F.Supp. 203 (E.D.La.

1979), disapproved of on other grounds, *Allied Chemical Corp. v. Hess Tankship Co.*, 661 F.2d 1044 (5th Cir.1981).

■ This being United States Coastwise trade, and private carriage, the Harter Act, 46 U.S.C. § 190 *et seq.* and the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1300, *et seq.* do not apply *ex proprio vigore. MARINE SULPHUR QUEEN*, 460 F.2d 89, 102 (2d Cir.), *cert. denied*, 409 U.S. 982, 93 S.Ct. 318, 34 L.Ed.2d 246 (1972).

■ The June 2, 1983 "Bill of Lading" issued by Alamo constituted a mere receipt for the goods carried, and did not constitute a document of title or contract of carriage between the parties. *Unterweser Reederei Aktiengesellschaft v. Potash Importing Corp.*, 36 F.2d 869 (5th Cir.1930). Furthermore, the coastwise nature of this carriage renders the COGSA incorporation clause [6] of that document inapplicable. Consequently, the terms and conditions agreed to by the parties during their phone negotiations constituted their contract of carriage. *See, Alamo*, 469 F.Supp. at 209.

■ When Marathon loaded barges ALAMO 7, ALAMO 9 and ALAMO 10 with straight-run naptha at Texas City, Texas, custody and control of the naptha passed to Alamo. Thus, a bailment relationship was established. *Commercial Molasses Corp. v. New York Tank Barge Corp.*, 314 U.S. 104, 108, 62 S.Ct. 156, 159, 86 L.Ed. 89 (1941); *Pure Oil Co. v. M/V CARIBBEAN*, 235 F.Supp. 299, 304 (W.D.La.1964), *aff'd*, 370 F.2d 121 (1966). This bailment relationship imposes upon the carrier a duty of ordinary care to safeguard the cargo. *Commercial Molasses*, 314 U.S. at 110, 62 S.Ct. at 160.

■ Although the burden of proof of Alamo's breach of its duty of ordinary care is upon Marathon, the shipper/bailor, Marathon, has carried that burden by showing that 1,273.01 barrels of its naptha were not delivered to its Garyville Refinery. As a result thereof, an inference of negligence on the part of Alamo Barge Lines arises by operation of law. *Commercial Molasses*, 314 U.S. at 112, 62 S.Ct. at 161.

■ Due to insufficient horsepower of the tow and Captain Talbert's incorrect helm instruction and improper course setting, the Court finds that Alamo failed to exercise ordinary care in the custody and carriage of the naptha and that this negligence proximately caused the loss.

The Court further concludes that Rim Maritime, K.K. and the NORCHEM are liable to Marathon Petroleum Company as a result of their negligence as set out hereinabove in causing the allision of the PHILIP ARTHUR and its flotilla with the NORCHEM and the NEPTUNE VOLANS and the ARBOREOUS.

■ Negligence of a non-carrying vessel which proximately causes an allision which results in damages to cargo, imposes upon the non-carrying vessel interest liability to cargo for its full loss. *The Atlas*, 3 Otto 302, 93 U.S. 302, 23 L.Ed. 863 (1876); *Allied Chemical Corp. v. Hess Tankship Co.*, 661 F.2d 1044, 1058 (5th Cir.1981). The United States Supreme Court's decision in *Reliable Transfer* does not affect the ability of innocent cargo to recover the whole of its damages from either Rim or Alamo. *Allied Chemical*, 661 F.2d at 1058; *Gulf Coast Transit Co. v. M/T ANCO PRINCESS*, 1978 AMC 2471 (E.D. La.1977).

■ Alamo's position that all the provisions of its barge charter party were agreed to by Marathon through their course of dealing, is not supported by the law or the evidence. The evidence did not demonstrate that Marathon, in prior contracts, accepted Alamo's Barge Charter Party. Although there were previous and regular contracts of carriage between the parties, each carriage was negotiated by

---

6. That clause provides, in pertinent part:
 If this Bill of Lading is a document of title to which the Carriage of Goods by Sea Act of The United States ... applies by reason of the port of loading or discharge being in territory in which said Act or other similar legislation is in force, this Bill of Lading shall have effect subject to the provisions of the said Act.

**1036**

telephone. In some instances, Alamo sent its Barge Charter Party, signed, to Marathon, but in other cases it did not. When the documents were sent to Marathon, they were usually sent after performance of the contract pursuant to the oral agreements for the carriage. Alamo failed to show that Marathon ever agreed to, or signed their Barge Charter Party. Alamo, in turn, never inquired into Marathon's failure to sign and return the documents. In order for a usage or custom to be binding, such that it adds to or modifies the terms of a contract, the usage or custom must be so uniform, long-established, understood, and generally acquiesced in, that it induces the belief in the parties that the parties contracted with reference to it, nothing appearing in their contracts to the contrary. 25 C.J.S. *Customs & Usages* § 2 (1966); *Premier Electrical Construction Company v. Miller-Davis Company*, 291 F.Supp. 295 (N.D.Ill.1968), *aff'd in part, rev'd in part*, 422 F.2d 1132 (7th Cir.) *cert. denied*, 400 U.S. 828, 91 S.Ct. 56, 27 L.Ed.2d 58 (1970). Alamo has made no such showing.

■■ The only reasonable inference from the manner in which the course of dealing occurred is that the "Barge Charter Party" (Plaintiff's Exhibit # 7) was employed to memorialize the parties agreement, and for billing purposes as to:

1. The price for transporting the naptha;
2. The quantity of naptha to be transported;
3. The date and time for loading and discharging the naptha;
4. The lay time to be allowed the tow in Texas City and Garyville;
5. The demurrage rate per hour.

Alamo failed to demonstrate by a preponderance of the evidence that Marathon intended to be bound by the printed matter appearing on the reverse of said Plaintiff Exhibit No. 7.

IV. *Damages*

The Court finds the damages from this allision to be as follows:

| | |
|---|---|
| Loss of the PHILIP ARTHUR | $350,000.00 |
| Damage to Marathon's naptha | $ 43,307.80 |
| Damage to the ARBOREOUS | $ 2,979.00 |
| Damage to the NEPTUNE VOLANS | $ 25,000.00 |
| Damage to the ALAMO 10 | $ 45,000.00 |
| Damage to the NORCHEM | $107,608.00 |

The damages to the PHILIP ARTHUR, ALAMO 10, and the NORCHEM total $502,608.00 and are to be apportioned between Alamo and Rim as follows:

Plaintiff, Alamo Barge Lines, Inc. — 65%

Defendant, Rim Maritime, KK — 35%

Intervenor, Marathon is entitled to judgment against either Alamo Barge Lines, Inc. and/or Rim Maritime, KK for the full extent of its loss, reserving to each party the right of contribution in accordance with the aforesaid proportions in the event that they pay in excess of their portion of Marathon's claim.

Intervenor, Panama Transworld Leasing, S.A. ("Panama"), as owner of the NEPTUNE VOLANS is entitled to judgment against Alamo Barge Lines, Inc. and/or Rim Maritime, KK for $25,000, reserving to each party the right of contribution in accordance with the aforesaid proportions in the event that they pay in excess of their portion of Panama's claim.

Intervenor, Teh-Hu Cargocean Management Co., Ltd. ("Teh-Hu"), as owner of the ARBOREOUS is entitled to judgment against Alamo Barge Lines, Inc. and/or Rim Maritime, KK for $2,979, reserving to each party the right of contribution in the aforesaid proportions in the event they pay in excess of their portion of Teh-Hu's claim.

As per stipulation of the parties, interest on the claims of Marathon, Panama, and Teh-Hu shall run from date of judgment; on all other claims, interest shall run from date of judicial demand.

ACCORDINGLY, the Clerk of Court is directed to enter judgment in accordance with the foregoing.