**YANGMING MARINE TRANSPORT CORP., Plaintiff,**

v.

**EAST COAST CHEMICALS AND PAPER CORP., Defendant.**

**No. 82 Civ. 4584 (JES).**

United States District Court, S.D. New York.

Sept. 14, 1986.

Cichanowicz & Callan, New York City, for plaintiff; Stephen E. Powell, of counsel.

Purrington, McConnell & Agus, New York City, for defendant; John H. McConnell, of counsel.

## OPINION AND ORDER

SPRIZZO, District Judge.

Plaintiff, Yangming Marine Transport Corporation ("Yangming"), brought this action for breach of contract. Yangming seeks to recover outstanding freight charges for five containers of wastepaper shipped aboard plaintiff's vessel from Baltimore to Taiwan for the defendant in January of 1982.[1] *See* Complaint at ¶¶ 4–7. The defendant, East Coast Chemicals and Paper Corporation ("East Coast") counterclaims for damages it allegedly suffered as a result of Yangming's refusal to ship thirty additional containers of wastepaper from New York and Baltimore to Taiwan during the same time period. *See* Counterclaim at ¶ 7.

A bench trial was held and both parties have filed post-trial briefs. Upon considering all of the evidence presented at trial, as well as all of the arguments made by the parties' counsel at trial and in their papers filed with the Court, the Court concludes that plaintiff is entitled to judgment on its claim set forth in the Complaint and defendant is entitled to judgment on its counterclaim. The following constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

## BACKGROUND

The defendant, East Coast, is a New York corporation, *see* Pre-Trial Order ("PTO") at ¶ 5(i), which exports wastepaper. *See* Tr. at 40. According to the testimony of Mr. Sharwell, the president of East Coast, wastepaper is used in the recycling business to make finished paper. *See id.* East Coast purchases the wastepaper in the United States and then sells the commodity to purchasers in countries, such as Taiwan and Korea, where there is no virgin pulp. *See id.* at 41. The testimony at trial establishes that the export market for wastepaper is highly competitive. *See id.* at 41–42. According to Mr. Sharwell, the freight rate is "the most integral" factor in determining which exporter will succeed in the competition for supply contracts. *See id.* at 42. This is because the freight rate costs more than the wastepaper itself. *See id.*

The plaintiff, Yangming, is a foreign corporation engaged in the international carriage of goods by sea. *See* PTO at ¶ 5(a). Solar International Shipping Agency Inc. ("Solar"), not a party to the action, is plaintiff's Atlantic and Gulf Coast agent. *See* PTO at ¶ 5(b). It is authorized to make bookings, to issue bills of lading and to collect ocean freight. *See id.* Glory International Forwarders Inc. ("Glory"), not a party to the action, is a freight forwarder. *See* Tr. at 44. Acting as defendant's agent, it is authorized to make bookings that reserve cargo space for the shipment of defendant's wastepaper.

On October 1, 1981, Yangming published a special freight rate for wastepaper at $1,300.00 per container. This rate applied only to wastepaper delivered to the pier prior to December 31, 1981. *See* Tr. 13–15. In late November, based on this freight rate, Mr. Sharwell was able to secure contracts for the sale of wastepaper to purchasers in Taiwan. *See* Tr. at 50–51; 83–85. After Mr. Sharwell guaranteed delivery of the wastepaper, the foreign purchasers issued irrevocable letters of credit to

---

1. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1333 (1983).

The Court's jurisdiction is conceded by the parties. *See* Pre-Trial Order at ¶ 1.

East Coast. *See* Tr. at 43, 51. East Coast then booked space on Yangming's vessels to ship the wastepaper.

Specifically, on November 30, 1981, Glory, acting on behalf of East Coast, telephoned Mr. Wang, the supervisor of traffic at Solar, and booked space for fifteen containers of wastepaper aboard plaintiff's vessel, the Ming Moon, traveling from Baltimore to Taiwan ("the Baltimore booking"). *See* Pl.Ex. 12. On December 17, 1981, Glory, again acting as East Coast's agent, contacted Solar and booked space for twenty containers of wastepaper aboard plaintiff's vessel, the Ming Star, traveling from New York to Taiwan ("the New York booking"). *See* Pl.Ex. 19.[2]

Once a booking was made, the normal shipping procedure between the parties was that plaintiff would release containers, which are used to carry the cargo aboard plaintiff's vessels, to East Coast's supplier of wastepaper. *See* Tr. at 33, 52, 56. The supplier then would load the wastepaper into the containers and return them to the pier. In December of 1981, however, Mr. Sharwell discovered that Yangming had only released five of the fifteen containers booked pursuant to the Baltimore booking. Moreover, Yangming had not released any of the containers booked pursuant to the New York booking. *See id.* at 51–52. Upon telephoning Yangming, Mr. Sharwell was informed that Yangming was cancelling both bookings because there was no space available for the wastepaper aboard plaintiff's vessels. *See id.* at 53.

Following this telephone call, Mr. Sharwell went to Solar and met with Solar's vice president of sales and traffic, Mr. Edward Yu. *See id.* at 53, 117. At that meeting, Mr. Yu again told Mr. Sharwell that there was no space available for the wastepaper on the vessels booked. *See id.* at 54, 118. Moreover, Mr. Sharwell's testimony, which the Court finds credible, establishes that Mr. Yu refused Sharwell's request that Yangming roll the bookings over and carry the wastepaper on ships with space available sailing later in January. Mr. Yu told Mr. Sharwell that he could not roll the bookings over because there was no space available for wastepaper on Yangming's vessels travelling later in January. *See id.* at 54–55. In addition, Mr. Yu told Mr. Sharwell that, in any event, Yangming did not want wastepaper cargo anymore and that therefore Yangming was raising the rate for wastepaper to $1,900.00 a container. *See id.* at 55.[3]

In accordance with what Mr. Yu told Mr. Sharwell, after Yangming's special freight rate for wastepaper of $1,300.00 per container expired on December 31, 1986, Yangming raised its rates for wastepaper to $1,900.00 per container. *See* Tr. at 23–24. On January 6, 1982, however, shortly after Yangming cancelled East Coast's bookings due to lack of available space, Yangming lowered its rate to $1,400.00 per container. *See id.* Yangming applied this lowered rate to cargo delivered to the pier after December 31, 1981 which was transported on ships sailing on or after January 6, 1982. *See id.* at 24–25.

Mr. Wang, the supervisor of traffic at Solar, testified that the rate was initially raised to $1,900.00 because, in December of 1981, it appeared that Yangming had too much cargo and not enough space. *See id.* at 23. According to Mr. Wang, however, in early January it became apparent that

**2.** The New York booking was initially booked on December 11, 1981 for a total of thirty containers. *See* Pl.Ex. 16, 17. The booking was subsequently split by Glory on December 17, 1981 to allocate twenty containers to East Coast and ten containers to another shipper of wastepaper.

**3.** Mr. Sharwell's testimony was corroborated by a telex he sent to Yangming's main office in Taiwan shortly after his conversation with Mr. Yu. *See* Tr. at 64–65, 121. In that telex, Shar-well complained that Yangming had cancelled all bookings of wastepaper "with no definite commitment as to when they will take cargo." *See* Def.Ex.F.

Mr. Yu, however, denied telling Mr. Sharwell that Yangming was shutting out all cargo shipments of wastepaper. *See* Tr. at 118–19. According to Mr. Yu, he merely told Sharwell that the specific vessels booked were full. *See id.* at 118. The Court does not find the testimony of Mr. Yu credible.

Yangming did not have enough cargo on ships sailing in January, and the rate was lowered in an effort to attract more cargo. *See id.* at 24.

On January 6, 1982, plaintiff's vessel, the Ming Star, left New York without any of East Coast's cargo, booked pursuant to the New York booking, aboard. *See id.* On or about January 15, 1982, however, Solar did issue two bills of lading for the shipment of the five containers which were previously released to East Coast pursuant to the Baltimore booking. *See* Pl.Ex. 1, 2. Plaintiff shipped those five containers aboard the Ming Moon, which left Baltimore for Taiwan on January 15, 1982. *See* Tr. at 24. Plaintiff's charge for this shipment, at the agreed upon rate of $1,300.00 per container was $6,500.00.[4] *See* Pl.Ex. 1, 2. It is undisputed that East Coast has not paid this freight charge. *See* Tr. at 39.

As a result of Yangming's cancellation of the New York booking and the remaining portion of the Baltimore booking, East Coast cancelled its existing agreements with the suppliers of wastepaper in New York and Baltimore and made arrangements to ship similar amounts of wastepaper to Taiwan from Florida and California. According to Mr. Sharwell, this was the least costly alternative means by which East Coast could fulfill its contractual obligations to the purchasers of wastepaper in Taiwan. *See* Tr. 92, 96.

## DISCUSSION

*Plaintiff's Claim*

■ Yangming's complaint seeks to recover the $6,500.00 ocean freight bill for carrying the five containers of wastepaper aboard the Ming Moon. *See* Complaint at ¶¶ 6–7. At trial, defendant presented no defense to this claim. *See* Tr. at 39–40. Moreover, in its post-trial memorandum, defendant conceded that plaintiff properly shipped the wastepaper and that defendant has not paid any part of the agreed-upon freight bill of $6,500.00. *See* Defendant

East Coast's Post-Trial Memorandum and Proposed Findings at 2–3. At the end of trial, the Court ruled in favor of the plaintiff on this claim, but stayed judgment pending the resolution of defendant's counterclaim. *See* Tr. at 161, 165.

*Defendant's Counterclaim*

Defendant counterclaims for $14,341.42 in damages as a result of Yangming's alleged breach of contract to transport the ten remaining containers of wastepaper booked on the Ming Moon pursuant to the Baltimore booking and the twenty containers booked on the Ming Star pursuant to the New York booking. *See* PTO at ¶ 4.

In defense of this counterclaim, plaintiff argues that both the New York and Baltimore bookings were conditional bookings subject to space availability. According to the plaintiff, there was no space available on either the Ming Moon or the Ming Star, *see* Plaintiff Yangming's Proposed Post-Trial Findings of Fact and Conclusions of Law at 3–4, and therefore plaintiff properly cancelled the bookings. *See id.* at 4; Plaintiff's Reply Memorandum at 2. Plaintiff specifically disclaims any obligation under the booking agreements to roll the bookings over and carry the cargo on vessels other than the Ming Moon or Ming Star, which may have had space available later in January.

Defendant, on the other hand, argues that the two bookings were firm rather than space available bookings. *See* Defendant East Coast's Post-Trial Memorandum and Proposed Findings ("Def. Mem.") at 6. Defendant also contends that even if the bookings were subject to space availability, Yangming breached the shipping agreement because there was space available on both the Ming Moon and the Ming Star. *See id.* at 9–10; Tr. at 112–13. Finally, defendant argues that, even if there was no space available on those specific ships, there was space available on Yangming's ships sailing later in January and that Yangming was contractually obligated to

---

**4.** Since the containers were loaded with wastepaper and delivered to the pier prior to December 31, 1981, Yangming rate was $1,300.00 per container. *See* Tr. at 12–15.

roll the bookings over to the next available ship. *See* Def. Mem. at 10.

█ The oral bookings in this action created a valid and binding contract of affreightment. *See Orient Mid-East Lines v. Albert E. Bowen Inc.*, 458 F.2d 572, 574 (2d Cir.1972); *Alamo Barge Lines, Inc. v. Rim Maritime Co., Ltd.*, 596 F.Supp. 1026, 1034 (E.D. Louisiana 1984). The Court agrees with the plaintiff, however, that the contracts were made subject to space availability. Solar's booking memos, which were prepared in the ordinary course of Solar's business, contain the notation "subject to space available." *See* Pl.Ex. 12, 19. At trial, defendant attempted to rebut these documents by offering Glory's booking memos into evidence. These memos, however, do not contain any notation as to whether the bookings were firm or subject to space availability. *See* Def.Ex. H, I. The Court concludes that plaintiff's documents, which clearly state that the bookings are conditional, are more persuasive than the defendant's documents, which do not even purport to deal with the issue of firm versus space available bookings.

Moreover, Mr. Wang testified that the bookings were made subject to space availability. *See* Tr. at 129, 136, 138. Since Mr. Wang accepted the bookings on behalf of Solar and Yangming, he clearly had personal knowledge of the terms of the bookings. In contrast, the only witness called by the defendant at trial, Mr. Sharwell, had no personal knowledge of the terms of the agreement. Although Mr. Sharwell testified that the bookings were firm, *see* Tr. at 46, an employee of Glory, not Mr. Sharwell, booked the shipments on behalf of East Coast with Yangming. That witness was not called at trial. Therefore, the Court does not find Mr. Sharwell's testimony on this issue persuasive.

Having concluded that the bookings were made subject to space availability, the Court must next determine whether there was space available aboard the vessels booked. Although both Mr. Wang and Mr. Yu testified that there was no space available on either Ming Moon or the Ming Star, *see* Tr. at 118, 140, Mr. Wang also testified that Yangming lowered their rates for wastepaper to $1,400.00 per container on January 6, 1982 because Yangming did not have enough cargo on vessels sailing later in January. *See* Tr. at 23–24, 30. In light of Mr. Wang's explanation as to why Yangming lowered its freight rate, the Court draws the obvious inference that there was space available on Yangming's vessels which sailed after January 6, 1982. Since the Ming Moon left Baltimore on January 15, 1982, *see* Tr. at 24, the Court concludes that there was space available for defendant's cargo aboard the Ming Moon.[5] Thus, Yangming clearly breached the Baltimore booking agreement when Yangming cancelled the booking due to lack of available space.

The Court finds, however, that the defendant has not sustained its burden of proving by a preponderance of the evidence that there was space available for the New York booking on the Ming Star. The Ming Star left New York on January 6, 1982. Although Yangming applied the $1,400.00 rate to cargo aboard the Ming Star, since the rate was not filed until January 6, *see* Tr. at 24–25, the Court is not persuaded that the lowered rate was precipitated by a need for extra cargo on that voyage. *Cf* Tr. at 27–28.

Since there was no space available on the Ming Star, the Court must determine whether the plaintiff was obligated to roll the booking over to the later voyages on which there was space available. In inter-

5. Plaintiff has made no reasonable attempt to explain the apparent inconsistency in Wang's testimony, to wit, that although plaintiff lowered its rates to attract more wastepaper in January, plaintiff had no space available aboard the Ming Moon which sailed on January 15. The only explanation offered by Wang was that in late December, when Yangming cancelled the bookings, it appeared that there would be no space available. This, however, has no bearing on the fact that space ultimately became available on the Ming Moon as of January 6, 1982 and that, under the parties' agreement, Yangming was therefore obligated to carry defendant's cargo.

preting the terms of the parties' booking contract, the Court must ascertain and effectuate the intent of the parties. *See Lipsky v. Com. United Corp.*, 551 F.2d 887, 896 (2d Cir.1976); *Skandia America Reinsurance Corp. v. Schenck*, 441 F.Supp. 715, 723-24 (S.D.N.Y.1977). Evidence of a prior course of dealing between the parties and evidence of trade usage is admissible to aid in the interpretation of the parties' agreement. *See* 11 *Williston, Contracts* § 648 (3d ed. 1968). For the reasons set forth below, the Court concludes that the parties intended that the New York booking would be rolled over where, as here, there was space available on later ships.

Mr. Sharwell testified that, during the eight years he had previously shipped wastepaper on Yangming's vessels, Yangming had always rolled over bookings when Yangming ran short of containers. *See* Tr. at 56. Moreover, Mr. Sharwell's understanding was that even on space available bookings, Yangming would roll the bookings over to subsequent ships. *See* Tr. at 102. Furthermore, he testified that the usual practice in the shipping industry is to overbook and then roll over cargo which does not get aboard a particular vessel. *See id.* at 101. The Court finds Mr. Sharwell's testimony on this point to be very credible.

Indeed, the initial testimony of Mr. Wang fully supports Sharwell's interpretation of the contract. Thus, Wang initially testified that if cargo was overbooked on Yangming's vessels, the cargo would be rolled over to the next ship with available space. *See* Tr. at 34. Significantly, Wang did not state that this roll-over procedure was inapplicable to space available bookings.

When Mr. Wang was recalled by the plaintiff as a witness in defense of the counterclaim, Wang for the first time suggested that the roll-over procedure varied according to whether a booking was firm or space available. According to Wang's revised testimony, Yangming first releases containers to firm bookings and then releases containers to space available bookings only if there is room for the cargo. *See* Tr. at 153. Moreover, Wang asserted that Yangming will only roll over bookings if the shipper's cargo was already delivered to the pier in Yangming's containers. *See* Tr. at 135, 136.[6] Given that Mr. Wang did not initially make any distinction between firm and space available bookings, and taking into account that the Court has already disbelieved Mr. Wang's testimony that there was no space available on the Ming Moon, the Court does not find Mr. Wang's revised testimony to be credible.

In short, in accordance with Mr. Wang's initial testimony and Mr. Sharwell's testimony, the Court concludes that, at the time of contract, both parties intended that Yangming would roll the New York booking over to subsequent ships if no space was available on the Ming Star and if space was available on subsequent voyages.[7] Moreover, as noted above, the Court concludes that there was space available on plaintiff's vessels which sailed after January 6, 1982. Plaintiff therefore breached the New York booking agreement when Mr. Yu refused to roll the bookings over to subsequent ships. *See* Tr. at 54-57.[8]

---

**6.** The Court notes that Wang was not unequivocal in his testimony with respect to Yangming's roll over policy on space available bookings. Thus, although Wang testified that Yangming would not roll over space available bookings unless the containers loaded with cargo were already delivered to the pier, Wang also testified that;

> If the shipper needs space on following vessel, that another story. We discuss again. We might issue another booking number. Of course, we have to find out if we have space available on the following vessel.

*See* Tr. at 135.

**7.** For the same reasons that the Court concludes that the plaintiff was obligated to roll over the New York booking, the Court also concludes that the plaintiff was obligated to roll over the Baltimore booking. Thus, even assuming *arguendo*, that there was no space available on the Ming Moon, because there clearly was space available on some of plaintiff's ships sailing in January, plaintiff still breached its agreement to carry defendant's cargo when Mr. Yu refused to roll over the Baltimore booking.

**8.** Mr. Wang testified that, upon cancellation of the bookings, he spoke to Glory and that Glory agreed to the cancellation. *See* Tr. at 137;

The only remaining issue raised by the parties with respect to defendant's counterclaim relates to damages. Defendant has adequately proved that they have suffered a loss of $14,341.42, representing increased shipping costs and increased costs in the supply of wastepaper, as a result of plaintiff's breach. *See* Tr. at 65–70. Plaintiff argues, however, that East Coast is not entitled to those damages because East Coast failed to properly mitigate its damages.

As the harmed party, East Coast was obligated to take whatever reasonable actions it could to minimize its damages. *See Air Et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 494 (2d Cir.1985). In an effort to satisfy its contractual obligations to the purchasers of wastepaper in Taiwan,[9] upon Yangming's cancellation of the Baltimore booking, East Coast arranged to have the same supplier of wastepaper supply the wastepaper at the same price in Miami instead of Baltimore. East Coast did this because the freight rate in Miami was less expensive than the lowest available rate in Baltimore. *See* Tr. at 92–93.

With respect to the New York booking, taking into account the available freight rates in other port cities, as well as the price and availability of wastepaper in those cities, East Coast mitigated its damages by cancelling its New York supply contract and purchasing the wastepaper in California. Although East Coast paid a higher price for the wastepaper in California, since the freight rate was so much cheaper in California than in New York, East Coast was able to properly minimize its damages by shipping from California. *See* Tr. at 66–67.[10]

Plaintiff argues that other shipping lines offered generally the same rate as Yangming in January of 1982 and that, therefore, East Coast could have shipped on other carriers in New York or Baltimore at a minimal increased cost. *See* Tr. at 144, 157–58.[11] The burden of proving that the defendant could have mitigated its damages by shipping on other lines in New York or Baltimore is on the plaintiff. *See Air Et Chaleur, S.A., supra,* 757 F.2d at 494; *Katz Communications v. Evening News Association,* 705 F.2d 20, 26 (2d Cir. 1983). The only evidence offered by plaintiff in support of this argument, however,

---

Pl.Ex. 14, 19. Assuming *arguendo* that Glory did agree to the cancellations, the Court fails to see the significance of this agreement. Since it was Solar's position that there was no space available at all on subsequent ships, and, indeed, that Yangming could no longer ship wastepaper, *see* Tr. at 54–57. Glory could reasonably assume at that time, that Yangming was not in breach of the booking contracts.

9. Although plaintiff argues that it had no knowledge of defendant's binding commitments in Taiwan, *see* Plaintiff's Reply Memorandum at 3, damages sustained by a party seeking alternative means of shipment following a breach of contract to carry goods, are clearly foreseeable and therefore properly cognizable. *Cf. Charles E.S. McLeod Inc. v. R.B. Hamilton Moving and Storage,* 89 A.D.2d 863, 865, 453 N.Y.S.2d 251, 253 (2d Dep't 1982); Restatement, Second, Contracts § 351(2) (1981).

10. Indeed, the freight rate in California was even less expensive than the $1,300.00 rate defendant had secured with Yangming. *See* Tr. at 69. The Court rejects plaintiff's argument that merely because all of defendant's increased costs with respect to the New York booking are

traceable to an increased cost of wastepaper and not to increased freight costs, that the defendant incurred no damages as a result of the cancellation of that booking. In fixing damages, the Court seeks to put the harmed party in as good a position as he would have been had the contract been properly performed. *See Wallace Steel Inc. v. Ingersoll Rand Co.,* 739 F.2d 112, 115 (2d Cir.1984). In order to put the defendant in as good a position as if plaintiff had shipped the wastepaper, the Court must allow the defendant to be compensated for any extra expenses incurred as a result of plaintiff's breach, so long as the defendant properly mitigated its damages. As noted *infra,* the weight of the credible evidence establishes that the defendant did properly mitigate its damages by repurchasing the wastepaper and shipping from California.

11. The Court rejects plaintiff's argument that East Coast could have simply rebooked with Yangming at the $1,400.00 rate. Mr. Yu of Solar had emphatically told Mr. Sharwell that Yangming was not accepting any more wastepaper. *See* Tr. at 56. Thus, it would have been futile for East Coast to have attempted to rebook space in January with Yangming.

was the conclusory testimony of Mr. Wang, which the Court does not find credible. While Mr. Wang asserted that other shipping lines' rates in January of 1982 were comparable to Yangming's rates, *see* Tr. at 144, he conceded that he had not even checked to see what the other lines' rates were before testifying. *See id.*

In contrast, Mr. Sharwell testified after reviewing the available rates for January of 1982 that all other shipping lines' rate were higher than Yangming's in January of 1982. *See* Tr. at 167–68. The Court therefore concludes that the weight of the credible evidence establishes that East Coast properly mitigated its damages by choosing the least costly means of fulfilling its contractual obligations to the purchasers in Taiwan.

### CONCLUSION

Plaintiff is entitled to damages in the amount of $6,500.00 as a result of defendants' failure to pay ocean freight bills due for shipments made aboard plaintiff's vessels.

Defendant is entitled to damages in the amount of $14,341.42 as a result of plaintiff's breach of an agreement to transport defendant's cargo.

Both parties are entitled to pre-judgment interest on their respective claims.

The parties shall submit an appropriate proposed judgment within two weeks of the date of this Opinion and Order.

It is SO ORDERED.

